# No. 25-1246

# In the United States Court of Appeals for the Tenth Circuit

American Car Rental Association,

*Plaintiff-Appellant,*

*v.*

Heidi Humphreys, in her official capacity as Executive Director of the Colorado Department of Revenue; Shoshana Lew, in her official capacity as Executive Director of the Colorado Department of Transportation; and Karen Stuart, in her official capacity as the Chair of the Colorado High-Performance Transportation Enterprise,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Colorado
Case No. 1:24-cv-2450 (District Judge Daniel D. Domenico)

## CORRECTED BRIEF OF APPELLANT

Jeffrey A. Friedman
Daniel H. Schlueter
Eversheds Sutherland (US) LLP
700 Sixth Street, NW, Suite 700
Washington, DC 20001-3980
(202) 383-0100
JeffFriedman@eversheds-sutherland.com
DanSchlueter@eversheds-sutherland.com
*Attorneys for Appellant*

September 12, 2025

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. iii

STATEMENT OF RELATED CASES......................................................... viii

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ...............................................................9

STATEMENT OF THE CASE ....................................................................11

    A.    Factual Background ....................................................................11

        1.    Colorado's Fee....................................................................11

        2.    Application to Airports .........................................................12

        3.    The Red Herring – Maybe There are Other Fees? ...................13

    B.    Proceedings in the District Court .......................................................16

SUMMARY OF ARGUMENT .......................................................................18

ARGUMENT..................................................................................................24

    A.    Standard of Review....................................................................24

    B.    Legal Background – The Statutes at Issue........................................25

    C.    The District Court Misconstrued Subsection (v). ............................30

        1.    The Fee is Preempted by Subsection (v). ................................30

        2.    The District Court's Reading of Subsection (v) Cannot Be Squared with its Text.....................................................31

            a.    The 1982 Preambulatory Language..............................34

            b.    Policy—Does the Statute Sweep Too Wide?.................39

        3.    The District Court's Reading Renders Subsection (iv) Superfluous..........................................................................43

D. The District Court Misapplied Its Test of "Disproportionate Effect." ....................................................................................48

CONCLUSION ...............................................................................................51

STATEMENT ON ORAL ARGUMENT ........................................................52

CERTIFICATE OF SERVICE.......................................................................53

CERTIFICATE OF COMPLIANCE..............................................................54

ATTACHMENTS............................................................................................55

Order Granting Defendants' Motion for Summary Judgment, entered May 29, 2025 (ECF No. 28) ......................................................56

Final Judgment, entered May 29, 2025 (ECF No. 29) ...................................70

Statutory Appendix .........................................................................................73

49 U.S.C. § 40116.................................................................................74

FAA Reauthorization Act of 2018, Pub. L. No. 115-254, § 159 132 Stat. 3186 ......................................................................................77

2024 Colo. Legis. Serv. Ch. 186 (S.B. 24-184) ..........................................78

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aloha Airlines, Inc. v. Dir. of Taxation,*
464 U.S. 7 (1983)..................................................................................3

*Ammex, Inc. v. Dep't of Treasury,*
726 N.W.2d 755 (Mich. Ct. App. 2006)........................................................43

*Avis Budget Group, Inc. v. City of Newark,*
48 A.3d 1113 (N.J. App. Div. 2012) ...........................................................4

*Bilski v. Kappos,*
561 U.S. 593 (2010)..............................................................................45

*BNSF Ry. Co. v. Hiett,*
22 F.4th 1190 (10th Cir. 2022)..................................................................25

*Bostock v. Clayton Cnty., Georgia,*
590 U.S. 644 (2020)..........................................................................23, 43

*Cerveny v. Aventis, Inc.,*
855 F.3d 1091 (10th Cir. 2017)..................................................................25

*City and Cnty. of Denver v. Continental Air Lines, Inc.,*
712 F. Supp. 834 (D. Colo. 1989) ...............................................................40

*D.C. v. Heller,*
554 U.S. 570 (2008)..............................................................................38

*Davis v. Mich. Dep't of Treasury,*
489 U.S. 803 (1989)..............................................................................26

*Gallardo v. Marstiller,*
596 U.S. 420 (2022)..............................................................................26

*Gibbons v. Ogden,*
22 U.S. (9 Wheat.) 1 (1824)......................................................................38

*Lewis v. Chicago,*
560 U.S. 205 (2010)..........................................................................22, 41

*Or. Waste Sys., Inc. v. Dep't of Env't Quality*,
   511 U.S. 93 (1994)....................................................................38-39

*Saban Rent-a-Car LLC v. Arizona Dep't of Revenue*,
   434 P.3d 1168 (Ariz. 2019).................................................................2

*Salem Transp. Co. v. Port Authority*,
   611 F. Supp. 254 (S.D.N.Y. 1985)......................................................40

*Tesone v. Empire Mktg. Strategies*,
   942 F.3d 979 (10th Cir. 2019).............................................................25

*Twp. of Tinicum v. U.S. Dep't of Transp.*,
   582 F.3d 482 (3d Cir. 2009).............................................................34-35

*US Airways, Inc. v. O'Donnell*,
   627 F.3d 1318 (10th Cir. 2010).........................................................24-25

*Western Air Lines, Inc. v. Board of Equalization*,
   480 U.S. 123 (1987).......................................................................27, 37

*Westfall v. United States*,
   274 U.S. 256 (1927).........................................................21, 22, 40, 41

**Statutes**

19 U.S.C. § 1555...............................................................................43

28 U.S.C.:
   § 1291......................................................................................10
   § 1331......................................................................................10
   § 1343......................................................................................10
   § 2201........................................................................................9

42 U.S.C. § 1983................................................................................9

49 U.S.C.:
   § 11501(b) ...............................................................................37
   § 14502....................................................................................37
   § 40116..............................................................................3, 25, 29
   § 40116(d) ...............................................................................37

49 U.S.C.:

§ 40116(d)(2)(A) ....................................................................34

§ 40116(d)(2)(A)(i)..........................................................36, 37

§ 40116(d)(2)(A)(ii).........................................................36, 37

§ 40116(d)(2)(A)(iii)........................................................36, 37

§ 40116(d)(2)(A)(v).....................................................6, 8, 9, 31

§ 47107(k)(2)........................................................................43

§ 47133 ...............................................................................42

C.R.S.:

§ 43-4-804(1)(a)(I)...............................................................14

§ 43-4-804(1)(a)(III) .......................................................14, 51

§ 43-4-804(1)(b) ..................................................................14

§ 43-4-805(1)(g)(III).......................................................14, 51

§ 43-4-805(5)(g) ..................................................................14

§ 43-4-806(7.6)(b) ...............................................................12

**Legislative History**

132 Cong. Rec. S6793-01 (June 5, 1986).............................................1

155 Cong. Rec. E2867 (Dec. 2, 2009)................................... 4, 5, 20, 36

157 Cong. Rec. H2198 (Mar. 31, 2011) ..................4-6, 20, 35-36, 42, 53

164 Cong. Rec. H3590 (Apr. 26, 2018)...................................7, 20, 35

21st Century Aviation Innovation, Reform, and FAA Reauthorization Act,
H.R. 2997, 115th Cong. (2017) ..................................................6

Aviation Innovation, Reform and Reauthorization Act of 2016,
H.R. 4441, 114th Cong. (2016) ..................................................6

FAA Reauthorization Act of 2018, Pub. L. No. 115-254, § 159,
132 Stat. 3186 (2018).........................................................6, 27

Ch. 5, 2009 Colo. Sess. Laws (SB 09-108): ....................................14, 50
sec. 1, § 43-4-804..............................................................14, 51

Ch. 186, 2024 Colo. Sess. Laws 1044: ................................................................11

    sec. 1(b) .........................................................................................................8

    sec. 1(d) .......................................................................................................12

    sec. 1(i) .....................................................................................................7, 12

    sec. 1(m) .......................................................................................................8

    sec. 1(n) ........................................................................................................8

    sec. 2(e) ........................................................................................................7

    sec. 2(f) .........................................................................................................8

    sec. 2(h) ........................................................................................................8

    sec. 11, § 43-4-803(27) ..............................................................................12

    sec. 13 ...........................................................................................................7

    sec. 13, § 43-4-806(7.6)(a)(I) .....................................................................11

    sec. 13, § 43-4-806(7.6)(a)(II)(D) ..............................................................11

    sec. 13, § 43-4-806(7.6)(b) .........................................................................11

Final Fiscal Note, SB 09-108, available at
    https://www.leg.state.co.us/clics/clics2009a/csl.nsf/fsbillcont3/636E40D6
    A83E4DE987257537001F8AD6?Open&file=SB108_fl.pdf ..........................15

Hearing before the Subcommittee on Commercial and Administrative Law
    of the Committee on the Judiciary, House of Representatives,
    111th Cong., 2d Sess., Serial No. 111-122 (June 15, 2010) ..............................6

Hearings Before the House Subcommittee on Transportation and
    Aeronautics of the Committee on Interstate and Foreign Commerce, 92d
    Cong., 2d Sess., Serial No. 92-74 (Jun. 19, 1972) ...........................................27

Pub. L. No. 93-44, 87 Stat. 88 (1973) .................................................3, 21, 26, 40

Pub. L. No. 97-248, § 532, 96 Stat. 324 (1982) .............4, 19, 21, 26, 34, 36, 37, 40

Pub. L. No. 103-305, § 112, 108 Stat. 1569 (1994) ...........................4, 21, 27, 40

Pub. L. No. 103-272 § 6(a), 108 Stat. 745 ........................................................34

S. Rep. No. 91-630 (1969) .................................................................................38

**Other Authorities**

American Heritage Dictionary (2d College ed. 1985) ...........................................33

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of
  Legal Texts 101 (2012) ....................................................................32, 45, 48

Black's Law Dictionary (6th ed. 1990) ...............................................................33

Cambridge Dictionary,
  https://dictionary.cambridge.org/dictionary/english/generally .........................33

David Y. Bannard, A Brief Flight Through Federal Airport Law,
  62 Fed. Law. 26 (July 2015) ..........................................................................42

Federal Aviation Administration, *The Economic Impact of U.S. Civil
  Aviation* (Sept. 2024), available at: www.faa.gov/2024-economic-
  impact-report.pdf ......................................................................................24, 49

Hellerstein et al., State Taxation (3d ed. 2000).....................................................2

Oxford English Dictionary (3d ed. 2015) .............................................. 9, 19, 31, 33

Robert A. Hazel, Understanding an Outlier: The U.S. System of Airport
  Governance and Economic Regulation, 87 J. Air L. & Com. 131 (2022).........42

Tax Foundation, Reforming Rental Car Excise Taxes (2019),
  available at www.taxfoundation.org/research/all/federal/reforming-rental-
  car-excise-taxes ..........................................................................................5, 49

# STATEMENT OF RELATED CASES

Pursuant to Tenth Circuit Rule 28.2(C)(3), counsel for Appellant American Car Rental Association states that there are no prior or related appeals.

# INTRODUCTION

*"Don't Tax Me, Don't Tax Thee, Tax that Fellow Behind the Tree."*
   *- Sen. Russell Long*

No one likes paying taxes. And there is nothing more American than trying to find new and inventive ways to shift the burden of taxation on to others—to tax not "me" or "thee," but those unlucky "fellows behind the tree" to whom Senator Long humorously (but sympathetically) referred.[1]

The existence of 50 states, each possessing its own taxing power and each catering to the needs of its own citizens, poses particular challenges in this regard. If the elected officials of one state (say, New York) could devise a way to require the residents of New Jersey to pay 10% of New York's taxes and alleviate New Yorkers of that burden, the measure would no doubt be popular—in New York. But, it would be considerably less popular in New Jersey, which might be expected to adopt retaliatory measures against New York in response. In a union of 50 states, efforts to shift the burden of taxation onto out-of-staters have the potential to tear down the union.

---

[1] Senator Long served as the Chairman of the Senate Finance Committee for 15 years from 1966 until 1981. His "fellow behind the tree" mantra, deployed as a way to embarrass those who sought to shift the burden of taxation onto others, became so associated with the Senator that upon his retirement from the Senate in 1986, President Reagan is said to have presented him a t-shirt containing the quotation. 132 Cong. Rec. S6793-01 (June 5, 1986).

These are not theoretical concerns. "There are literally hundreds of Supreme Court cases involving challenges to state taxes that draw lines between in-staters and out-of-staters."[2] The Privilege and Immunities and Commerce Clauses of the Constitution forbid the most flagrant of these abuses. But there are ways to evade these limitations—by adopting taxes, for example, that apply to both residents and non-residents but disproportionately burden non-residents.[3]

Airports, filled with travelers, many of whom are residents of other states, are particularly vulnerable to these sort of discriminatory taxes designed to shift tax burdens to non-residents. A tax on airport travelers would apply to both residents and non-residents alike, but compared to a generally imposed tax, would disproportionately hit non-residents and would therefore be an effective way to export tax burdens to out-of-state residents. Congress has, for that reason, adopted a series of statutes restricting the manner in which states and localities may tax commerce at the airport.

This case involves a new highway user fee that Colorado adopted in May 2024. The fee is called a "user fee," but it is imposed on only one highway user—those who rent cars. Fifty percent of car rentals take place at the airport. The

---

[2]     Hellerstein et al., State Taxation ¶ 3.05, at 3-34 (3d ed. 2000).

[3]     *See*, *e.g.*, *Saban Rent-a-Car LLC v. Arizona Dep't of Revenue*, 434 P.3d 1168, 1172-73 (Ariz. 2019)

question is whether Colorado's fee is preempted at the airport by 49 U.S.C. § 40116—the Code provision where Congress' restrictions on state taxation of airport related commerce have been collectively codified.[4]

1. **<u>Statutory Background.</u>** First, some background on the relevant provisions. Congress enacted the initial federal restrictions on state and local taxation of air travelers in 1973. *See* Pub. L. No. 93-44, § 7(a), 87 Stat. 88, 90 (1973).[5] That first statute, the Airport Development Acceleration Act of 1973, prohibited state and local taxation of the air transportation service itself. It was prompted by the proliferation of so-called "head taxes"—per passenger charges certain states and localities sought to collect on enplaning and deplaning passengers at airports within their jurisdictions. *See Aloha Airlines, Inc. v. Dir. of Taxation*, 464 U.S. 7, 9-10 (1983). But the federal statute swept broader than just head taxes; it prohibited any tax levied on the sale or gross receipts from air transportation. *See*, *e.g.*, *id*. at 14-15 (finding Hawaii gross receipts tax preempted).

The 1973 statute, however, proved only a partial solution to the problem, as states and localities developed new ways to tax air travel. In 1982, Congress adopted additional legislation prohibiting discriminatory property tax assessments on

---

[4] The statute applies to "fees" and other "charges," as well as "taxes." Like the district court, we refer only to "taxes" for the sake of simplicity. (V-II, A374 n.1).

[5] Codified originally at 49 U.S.C. § 1513; subsequently recodified to 49 U.S.C. § 40116(b) in 1994.

airlines. *See* Pub. L. No. 97-248, § 532, 96 Stat. 324 (1982).[6] And in 1994, in response to a proliferation of special taxes on ancillary airport services, such as airport shuttle services and airport concessions, Congress legislated again, extending statutory protections to "any" type of business operating at the airport. *See* Pub. L. No. 103-305, § 112, 108 Stat. 1569 (1994).[7]

The 1994 legislation was significant in that it expanded federal protections beyond air travel to other types of businesses frequented by air travelers. However, the 1994 legislation had a substantial limitation. It prohibited only those taxes that were levied "exclusively" on airport businesses. *See id.* Predictably, that led states and localities to impose "non-exclusive" taxes, which targeted businesses and industries that were *disproportionately* located at airports, but not *exclusively* located there. Rental cars were the poster child. Between 1990 and 2010, states and localities in 43 states enacted more than 115 new taxes on rental vehicles.[8] These taxes were used to fund a variety of projects having nothing to do with the airport,

---

[6] Codified originally at 49 U.S.C. § 1513; subsequently recodified to 49 U.S.C. § 40116(d)(1)-(2) in 1994.

[7] Codified at 49 U.S.C. § 40116(d)(2)(A)(iv).

[8] *See* 155 Cong. Rec. E2867 (Dec. 2, 2009) (Rep. Boucher); 157 Cong. Rec. H2198, H2199 (Mar. 31, 2011) (Rep. Cohen); *Avis Budget Group, Inc. v. City of Newark*, 48 A.3d 1113, 1112 (N.J. App. Div. 2012).

but instead benefited local residents. They included sport stadiums, convention centers, performing arts centers, and in one case, a culinary institute.[9]

In 2011, one House representative explained the situation as follows:

> Just to give you a little bit of background, in 1994, when we were doing the FAA reauthorization bill, Congress recognized the importance of airports to interstate commerce and enacted legislation to prevent State and local government from imposing discriminatory taxes on airport users to fund local projects unrelated to airport infrastructure improvement, maintenance, and operations.
>
> However, for nearly 20 years, State and local governments have taken advantage of a loophole by applying the burden of the tax not only to airport users but all similar entities within that taxing jurisdiction. This has allowed State and local governments to completely circumvent the intent of Congress and levy discriminatory taxes against interstate travelers, in particular rental car customers.[10]

---

[9] *See* 155 Cong. Rec. E2867 (Dec. 2, 2009) (Rep. Boucher); *see* Tax Foundation, Reforming Rental Car Excise Taxes (2019), available at www.taxfoundation.org/research/all/federal/reforming-rental-car-excise-taxes (listing five professional sports stadiums funded with rental car taxes).

[10] *See* 157 Cong. Rec. H2198, H2199 (Mar. 31, 2011) (Rep. Graves).

In 2010, Congress held hearings, focusing specifically on the proliferation of rental car taxes.[11] It considered legislation in 2011,[12] 2016,[13] and 2017,[14] and in 2018, Congress ultimately enacted the specific legislation that is at issue in this case—Section 159 of the FAA Reauthorization Act of 2018, Pub. L. No. 115-254, 132 Stat. 3186 ("Section 159").

Section 159 applies not only to rental cars but to any "business located at a commercial service airport."[15] It added a new subsection to 49 U.S.C. § 40116(d)(2)(A) ("Subsection (v)"), barring states and localities from imposing any new tax on airport businesses. The only exceptions are for (i) taxes that are "generally imposed on sales or services"; (ii) taxes "wholly utilized for airport or aeronautical purposes," and (iii) certain aviation fuel taxes. Existing taxes are grandfathered in; Section 159 applies only to new taxes enacted after its effective date, i.e., October 5, 2018.[16] The point of Section 159, according to its sponsor, was

---

[11] *See* Serial No. 111-122, Hearing before the Subcommittee on Commercial and Administrative Law of the Committee on the Judiciary, House of Representatives, 111th Cong., 2d Sess. (June 15, 2010).

[12] *See* 157 Cong. Rec. H2198 (Mar. 31, 2011).

[13] *See* Aviation Innovation, Reform and Reauthorization Act of 2016, H.R. 4441, 114th Cong. (2016).

[14] *See* 21st Century Aviation Innovation, Reform, and FAA Reauthorization Act, H.R. 2997, 115th Cong. (2017).

[15] *See* Pub. L. No. 115-254, § 159(a), 132 Stat. 3186, 3220 (2018) (the full text of Section 159 is included in the attached statutory appendix).

[16] *See* Pub. L. No. 115-254, § 159(b).

to "prevent . . . local and state governments from targeting certain industries for discriminatory taxes, like the car rental industry."[17]

**2. <u>Colorado's Fee</u>.** Section 159 has been successful in its purpose. The avalanche of rental car fees and taxes ceased almost immediately after its enactment. That changed, however, on May 16, 2024, with Colorado's enactment of Chapter 186, which imposes the fee at issue in this case—a new "Congestion Impact Fee" assessed at a rate of $3 per day on all rental vehicles in the state. *See* Ch. 186 sec. 13, 2024 Colo. Sess. Laws 1044 (the "Fee").

The Fee must be collected by all rental vehicle businesses, and paid over to the state Department of Revenue. The Fee has several notable features:

> ***First***, despite its name (the "Congestion Impact Fee") and despite its stated purpose (to "mitigate the impact that automobiles place on the public highway system"),[18] the Fee applies to *only one* type of highway user and only one source of highway congestion—rental vehicles. No other highway user pays the fee.
>
> ***Second***, the statute enacting the Fee acknowledges that rental vehicles account for approximately "three percent [3%] of vehicle miles traveled . . . on Colorado roadways."[19] Non-rental vehicles, responsible for 97% of vehicle miles traveled, pay no fee.
>
> ***Third***, the Act provides that the Fee will be used for transportation projects throughout the state, with particular

---

[17]     *See* 164 Cong. Rec. H3590, H3597 (Apr. 26, 2018) (Rep. Graves).

[18]     *See* Ch. 186 sec. 2(e).

[19]     *See* Ch. 186 sec. 1(i).

emphasis on a proposed railway project connecting Fort Collins and Trinidad.[20]  There is no provision requiring fees collected at the airport to be used at the airport.

The Fee is exactly the kind of imposition that Congress sought to preempt with its enactment of Section 159 in 2018.  Because half of all rental vehicle transactions occur at the airport, half of the fee will be collected from airport travelers and businesses.  The Fee does not come within any of the statutory exclusions.  It is not "generally imposed on sales or services," 49 U.S.C. § 40116(d)(2)(A)(v), but is instead targeted to one *particular* type of service, the rental of vehicles.  Nor is it "wholly utilized for airport or aeronautical purposes." *Id*.  The purpose of the Fee, according to the Act itself, is to provide a dedicated funding source for transit and rail projects throughout the State, with particular emphasis on the proposed railway project connecting Fort Collins and Trinidad.  Ch. 186, sec 1(b) and 2(h).  It is precisely this kind of fee—imposed on airport travelers but used for non-airport purposes—that Congress sought to foreclose with its enactment of Subsection (v) in 2018.

**3. <u>This Case</u>**.  Shortly after the Fee was enacted, ACRA brought this case on behalf of its members seeking a declaration that the Fee was invalid insofar as it applied to airport locations.  ACRA also sought an injunction enjoining the Fee at airport locations.  On cross-motions for summary judgment, however, the district

---

[20]    *See* Ch. 186 sec. 1(m)-(n), 2(f), (h) ("front range passenger rail").

court found that the Fee was not preempted because the Fee applied statewide to all vehicle rental transactions in the state, whether at the airport or not.

The district court's determination was based on a misreading of the statutory exclusion for "generally imposed" taxes. The court read the exclusion to apply if the tax in question was "generally imposed throughout the . . . taxing jurisdiction." (V-II, A374-75.)[21] But that is not what the statute says. The statute's language specifies *what* the tax must be "generally imposed" on to fall within the exclusion. It must be "generally imposed *on sales or services*." 49 U.S.C. § 40116(d)(2)(A)(v) (emphasis added). This is not a geographic restriction. It is a subject matter restriction, intended to stop the proliferation of special taxes aimed at businesses and industries concentrated at airports. To fall within the exclusion, the tax or fee must be imposed "generally" (i.e., "widely, extensively"[22]) on "sales" or "services." The Colorado Fee is not that. It is imposed narrowly on one particular service, *i.e.*, short-term rental vehicles, not sales or services generally like Colorado's sales tax.

## JURISDICTIONAL STATEMENT

ACRA seeks declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983. The district court had subject matter jurisdiction pursuant to

---

[21]    Citations to the Appendix follow the format "V-[v#], [p#]" where "v#" refers to the volume number, and "p#" refers to the page number.

[22]    *See* Oxford English Dictionary (3d ed. 2015).

28 U.S.C. § 1331 and 28 U.S.C. § 1343. On May 29, 2025, the district court denied ACRA's Motion for Summary Judgment and granted Defendant's Cross-Motion, (V-II, A370), and issued a final judgment in Defendant's favor dismissing ACRA's complaint (V-II, A383). Appellant filed a timely Notice of Appeal on June 24, 2025. (V-II, A385.) This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether Colorado's Congestion Impact Fee (the "Fee") on airport vehicle rentals is preempted by Subsection (v) because the Fee is not "generally imposed on sales or services" and is not used "wholly for airport or aeronautical purposes."

**STATEMENT OF THE CASE**

**A.      Factual Background**

      1.      <u>Colorado's Fee</u>

The "Congestion Impact Fee" was considered and enacted by Colorado's General Assembly during its 2024 Regular Session. The measure passed the Senate as Senate Bil 24-184 on April 17, 2024, and it passed the House on May 4, 2024. The governor signed it on May 16, 2024. The enacted law is designated Chapter 186 of the 2024 session laws. *See* Ch. 186, 2024 Colo. Sess. Laws 1044.

The statute enacting the Fee directs the Colorado Transportation Investment Office (CTIO) to impose the Fee at a maximum rate of $3 per day "on all short-term vehicle rentals," beginning January 1, 2025. Ch. 186, sec. 13, § 43-4-806(7.6)(a)(I). "Short term" is defined to be any period not more than thirty days. *Id.*, sec. 13, § 43-4-806(7.6)(a)(II)(D). On September 23, 2024, CTIO announced that the Fee for the 2024-2025 fiscal year would be payable at the maximum rate, i.e., $3 per day.[23]

The Fee is required to be collected by the Department of Revenue. *Id.*, sec. 13, § 43-4-806(7.6)(b). Although vehicle rental businesses are entitled to charge the Fee through to their customers, the responsibility for filing returns and making payment of the Fee falls on rental businesses themselves. The Department of Revenue has published a form for reporting the Fee, Colo. Form DR 1777, that rental

---

[23]      V-I, A63.

business are required to prepare and file monthly, along with their payment of the Fee.[24]

The Act defines the Fee to be a "user fee," *see* Ch. 186, sec. 11, § 43-4-803(27), whose purpose is to "support investment" in "offsets such as transit and rail services . . . to reduce congestion on the public highway system," *id.*, sec. 1(d). Although denominated a "user fee," the Fee applies solely to one type of highway user—rental vehicles—which according to the legislative declaration made part of the statute, account for approximately "three percent [3%] of the vehicle miles traveled (VMT) on Colorado roadways." *Id.*, sec. 1(i). The Fee is not applicable to any other type of vehicle. No other highway "user" pays an "impact fee" for congestion.

### 2. Application to Airports

Colorado car rental businesses are required to collect and pay the Fee, including those located at commercial service airports or operating as a permittee of such an airport. *See* C.R.S. § 43-4-806(7.6)(b). Colorado has more than a dozen commercial service airports.[25] Numerous car rental businesses are located at these commercial service airports or are operating as permittees of such airports.[26]

---

[24]    V-II, A319.

[25]    *See* V-I, A64; V-I, A66; V-I, A68.

[26]    V-I, A81.

Because airport locations account for approximately 50 percent of vehicle rentals, a significant portion of the Fee—approximately 50 percent—will be collected from airport car rental businesses.[27]  On a miles-driven basis, the fee falls disproportionately on vehicles rented from airport locations, compared to other vehicles.  Vehicles rented from airport locations account for approximately 1.5% of vehicles miles traveled on Colorado's roadways (50% of 3%), but they pay 50% of the Fee.

### 3.    The Red Herring – Maybe There are Other Fees?

In its Reply Brief filed on summary judgment, the State hypothesized, for the first time, that there might be other fees imposed on non-rental vehicles that could justify the state's decision to impose the Congestion Impact Fee only on rental vehicles.  (V-II, A379, quoting Dkt. 27 at 4-5 [V-II, A358-59] ("[V]ehicle owners in Colorado pay a variety of fees to support Colorado's surface transportation infrastructure that renters do not.")  The State pointed to two fees—Colorado's Bridge Safety Fee and its Road Safety Fee—as support for this suggestion.  (V-II, A358-59.)

In its opinion in this case, the district court endorsed the State's suggestion that the Congestion Impact Fee is "offset" in part by these two fees on non-rental

---

[27]    V-II, A372; V-I, A193.

vehicles. (V-II, A379.) But the district court was misled. There is no basis for this conclusion, and it is not correct.

The two fees the State identified, the Road Safety Fee and the Bridge Safety Fee, were both adopted in 2009.[28] The Road Safety Fee ranges from $16-$39 per year (depending on the weight of the vehicle), and the Bridge Safety Fee ranges from $16 to $32 per year (again based on vehicle weight). C.R.S. § 43-4-804(1)(a)(I); C.R.S. § 43-4-805(5)(g).

Although the State failed to mention it in its brief to the district court, as part of the same 2009 legislation adopting these two fees, the legislature adopted a third fee, a compensating fee on rental vehicles called the "Daily Vehicle Rental Fee."[29] The Daily Vehicle Rental Fee is imposed on rental vehicles at $2 per day (and is not to be confused with the newly-enacted Congestion Impact Fee, which is imposed at another $3 per day). C.R.S. § 43-4-804(1)(b). The reason rental vehicles are not subject to the Road Safety Fee and the Bridge Safety Fee is because they pay the Daily Vehicle Rental Fee instead. *See* C.R.S. § 43-4-804(1)(a)(III) ("The road safety surcharge shall not be imposed on any rental vehicle on which a daily vehicle rental fee is imposed pursuant to paragraph (b) of this subsection (1)."); C.R.S. § 43-4-805(1)(g)(III) ("The bridge safety surcharge shall not be imposed on any rental

---

[28]  *See* Ch. 5, 2009 Colo. Sess. Laws (SB 09-108).

[29]  *See id.*, sec. 1, § 43-4-804.

vehicle on which a daily vehicle rental fee is imposed pursuant to section 43-4-804(1)(b).").  All three fees were enacted together and are earmarked for bridge and road safety in the same manner.[30]  Notably, however, the Daily Vehicle Rental Fee is imposed at a rate that is far higher than the Bridge Safety and Road Safety Fees.  The maximum amount of the Daily Vehicle Rental Fee is $730 per year (365 X $2/day), compared to a maximum of $71 on non-rental cars.[31]

Given this history, there is no basis for the State's suggestion that the Congestion Impact Fee, enacted in 2024, "offsets" the Road Safety and Bridge Safety Fees, enacted 15 years earlier in 2009.  The Bridge and Road Safety Fees were already subject to a compensating fee imposed on rental vehicles, the Daily Vehicle Rental Fee, which was adopted at the same time, to be used for the same purposes and was notably imposed at a significantly higher rate than those other two fees.

---

[30]    Final Fiscal Note, SB 09-108, available at https://www.leg.state.co.us/clics/clics2009a/csl.nsf/fsbillcont3/636E40D6A83E4D E987257537001F8AD6?Open&file=SB108_f1.pdf

[31]    On a *daily* basis, the Road Safety and Bridge Safety fees range from eight cents ($0.08) per day up to 19 cents ($0.19) per day—amounts that are far less than the $2 per day Daily Vehicle Rental Fee.  To be sure, rental vehicles may not be rented every day of the year, but the daily rate difference is sufficiently vast (10-20 times) that it is very unlikely that the yearly fees on a rental vehicle would ever be less than those on a non-rental vehicle.  Indeed, the Daily Vehicle Rental Fee was projected to generate approximately 12% of the total revenue from the three fees, even though rental vehicles are responsible for only 3% of highway use.  *See* Final Fiscal Note, SB 09-108.

## B. Proceedings in the District Court

Shortly after the Congestion Impact Fee was enacted, ACRA commenced this case in the district court challenging the validity of the Fee at airport locations pursuant to 49 U.S.C. § 40116. Its complaint sought a declaratory judgment declaring the Fee invalid and preempted by Subsection (v), as well as a permanent injunction enjoining the Fee's application at the airport.

Because the issues were primarily legal, the parties agreed to an expedited schedule for summary judgment and filed cross-motions for summary judgment on December 20, 2024. The district court issued an order on those motions on May 29, 2025 without oral argument, granting Defendant's motion and denying Plaintiff's cross-motion. (V-II, A382.)

The district court found that the Fee was valid under Subsection (v) because it fell within that provision's exclusion for taxes that are "generally imposed on sales or services." (V-II, A375.) The Court framed the issue as whether the "'generality' requirement [is] one of subject matter or one of geography." (*Id.*) It found that it was the latter and that the Fee passed muster because it was "generally imposed throughout the ... taxing jurisdiction," i.e., throughout Colorado. (V-II, A374-75.)

In so concluding, the Court acknowledged that when Congress enacted Subsection (v) in 2018, the statute already contained a geography-based restriction in Subsection (iv), which prohibited taxes levied "exclusively" at the airport.

16

Subsection (iv) thus already required that, to be valid, taxes and fees had to be levied both on and off the airport. The Court also acknowledged that the canon against superfluity counseled that Subsection (v) had to mean something different from Subsection (iv). (V-II, A376-77.) But the Court determined that the geography-based restriction in Subsection (v) was different than the one in Subsection (iv), prohibiting not only taxes "exclusive" to the airport but also those that "disproportionately affect airports" (V-II, A375, A377), or have a "discriminatory impact against airport businesses" (V-II, A379.)

The Court did not explain what showing had to be made for a tax to have a "disproportionate effect" or "discriminatory impact," but it acknowledged, by way of example, that if 99% of taxed transactions occurred at the airport and only 1% occurred off-airport, the tax would "likely" have a prohibited disproportionate effect. (V-II, A378.) The Court determined that there was no disproportionate effect in the case of the Congestion Impact Fee, however, because "only" 50% of rental car transactions were at the airport. (*Id.*)

**SUMMARY OF ARGUMENT**

For over 50 years, federal law has prohibited state and local taxes that discriminate or impose undue burdens on air travelers and the businesses that serve those travelers. The problem, inherent in all such taxes, is that they export tax burdens to non-residents and in the process restrict the free flow of interstate commerce and interstate travel.

A tax can target air travelers directly by singling out businesses at the airport specifically. Or it can target them less directly by singling out the types of goods and services that tend to be sold at the airport. In 1994, Congress prohibited the former, but not the latter, which resulted in a spate of taxes targeting services located disproportionately but not exclusively at the airport, rental cars being the most prominent example. So, in 2018, Congress closed the loophole—although its remedy swept broader than just services located disproportionately at the airport. Subsection (v) adopts a bright-line rule prohibiting taxes that single out specific services for taxation, unless used specifically for airport purposes. Colorado's Fee is squarely preempted under this provision.

The district court reached a contrary interpretation of Subsection (v) only by misreading its exclusion for "generally imposed" taxes. The court read the exclusion to apply if the tax in question was "generally imposed throughout the . . . taxing jurisdiction." (V-II, A374-75.) But as described in the Introduction to this brief,

that is not what the statute says.  The statute's language specifies *what* the tax must be "generally imposed" on to be valid.  It must be "generally imposed *on sales or services*."  This is not a geographic restriction.  It is a subject matter restriction.  To fall within the exclusion, the tax or fee must be imposed "generally" (i.e., "widely, extensively"[32]) on "sales" or "services."  And as described above, the Colorado Fee is not that.  It is imposed narrowly on one particular service, *i.e.*, short-term rental vehicles, not sales or services generally.

While acknowledging that ACRAs interpretation was "not implausible," (V-II, A375), the district court rejected it for two reasons.  Neither of those two reasons stands up to scrutiny.  First, the court pointed to a legislative finding that Congress added to the statute in 1982.[33]  That finding states that the practices prohibited by the statute were prohibited "because [they] unreasonably burden and discriminate against interstate commerce."  (V-II, A375, quoting 49 U.S.C. § 40116(d)(2)(A).)  The district court understood the labeling of such practices as "discrimination" to mean that a tax must discriminate on the basis of geography, i.e., between on-airport and off-airport locations, to be invalid.  But the "discrimination" label applies just as comfortably to a tax that discriminates on the basis of subject matter.  A tax that

---

[32]     *See* Oxford English Dictionary (3d ed. 2015).

[33]     Pub. L. No. 97-248, § 532(b), 96 Stat. 324 (1982) (originally codified at 49 U.S.C. §1513(d)(1), currently codified at 49 U.S.C. § 40116(d)(2)(A)).

singles out a particular form of interstate commerce for taxation, e.g., rental vehicles, "discriminates" against that form of interstate commerce. That reading is substantiated not only by common usage, but also by the legislative record here. That record repeatedly refers to taxes that single out particular industries, such as the rental car industry, as "discriminatory" taxes.[34]

The district court's second objection was essentially policy-based. The court was concerned the statute would sweep too wide if ACRA's reading were accepted. It would prohibit all special industry taxes at the airport—not only those that disproportionately affect airport businesses (the principal evil that Congress sought to prevent), but also those that do not. The Court pointed to a hypothetical tax on plastic bottles as an example. (V-II, A375.) But that is no reason for refusing to enforce the statute as written. Congress has flexibility to determine how broad or

---

[34] *See* 164 Cong. Rec. H3590, H3597 (Apr. 26, 2018) (purpose of Section 159 was to "prevent … local and state governments from targeting certain industries for *discriminatory taxes*, like the car rental industry") (Rep. Graves); 157 Cong. Rec. H2198, H2199 (Mar. 31, 2011) (Rep. Graves) ("[F]or nearly 20 years, state and local governments have taken advantage of a loophole by applying the burden of the tax not only to airport users but all similar entities within that taxing jurisdiction. This has allowed state and local governments to completely circumvent the intent of Congress and levy *discriminatory taxes* against interstate travelers, in particular rental car customers."); *id.* ("Since 1990, more than 117 *discriminatory rental car excise taxes* have been enacted in 43 States and the District of Columbia.") (Rep. Cohen); *id.* ("[on]-going crisis of *discriminatory taxes* placed on rental car transactions"); 155 Cong. Rec. E2867 (Dec. 2, 2009) ("the bulk of … additional charges [on rental vehicles] are state and local *discriminatory excise taxes* on car rental consumers—local taxes imposed to build sport stadiums, convention centers, etc.") (Rep. Boucher).

how narrow to craft legislation.  As Justice Holmes said almost a century ago: "[W]hen it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented, [Congress] may do so.'"  *Westfall v. United States*, 274 U.S. 256, 259 (1927).

And it is easy to see why Congress would have made that determination here. The entire 50-year history of federal regulation in this area had been an extended game of tax "whack-a-mole."  Every time Congress preempted one type of tax, states and localities responded with workarounds accomplishing the same result: exporting the tax base to air travelers.  When Congress enacted its original restrictions prohibiting taxation of air transportation in 1973,[35] states and localities responded with discriminatory property taxes on airlines.  When Congress prohibited those in 1982,[36] states and localities responded with taxes targeting ancillary airport services. When Congress prohibited those in 1994,[37] states and localities responded with taxes targeting industries that were disproportionately, but not "exclusively," at airports. This history was well-known when Congress acted again in 2018 to close the loophole left open by its 1994 legislation.  While Congress *could* have acted narrowly and prohibited only certain types of taxes, that risked having another type

---

[35]     Pub. L. No. 93-44, § 7(a), 87 Stat. 88, 90 (1973).

[36]     Pub. L. No. 97-248, § 532, 96 Stat. 324 (1982).

[37]     Pub. L. No. 103-305, § 112, 108 Stat. 1569 (1994).

of tax pop up and take its place. It was wholly within Congress' discretion to craft a bright-line rule that "embrace[d] more than the precise thing to be prevented." *Westfall*, 274 U.S. at 259. *See also Lewis v. Chicago*, 560 U.S. 205, 215 (2010) ("It is not for us to rewrite the statute so that it covers only what we think is necessary to achieve what we think Congress really intended.").

Moreover, the policy consequences the district court points to here are illusory. Contrary to the district court's assumption, ACRA's reading of Subsection (v) would not prohibit states from enacting targeted taxes and fees at the airport. If a state determines that a tax on plastic water bottles is important to discourage their use, then by all means, the tax may be imposed even at the airport. But Subsection (v) would require the revenues from airport locations to be used solely for airport purposes. That safeguard exists to avoid what we have here in Colorado's Fee, which is the temptation to use airports (and the non-residents that frequent them) as a piggy bank to fund unrelated projects, such as sports stadiums, that benefit the state as a whole.

The district court also expressed a concern that ACRA's interpretation would distort the market; it would give a "special, exempt position" to airport businesses and create an incentive for "consumers of certain goods . . . to purchase them at airports." (V-II, A375.) But airports already contain much more extensive zones offering entirely tax free shopping—duty-free zones—and there is no suggestion that

the market for M&Ms and perfumes has been adversely affected. Is it realistic to expect consumers to flock to airports, pay $5 (or more) for parking, and walk a quarter mile to the nearest gift shop—all so that they can avoid a 5 or 10 cent tax on plastic water bottles? The economics seem dubious, but even if they were not, they are concerns for Congress, not the Courts. *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 680-81 (2020) ("The place to make new legislation, or address unwanted consequences of old legislation, lies in Congress.")

Finally, the district court compounded its error of statutory interpretation by creating and then misapplying a test of "disproportionate [e]ffect"/"discriminatory impact" (the court used both terms). The court read this test into Subsection (v) to create some distance between Subsection (iv) and Subsection (v), because it read both as geographic restrictions. But the court applied the test in a way that can only be described as arbitrary.

The Court reasoned that a tax that was 99% applicable to airport locations was "disproportionate" and unlawful, but one that was 50% applicable to the airport was not. (V-II, A378.) But why is 99% disproportionate and 50% not disproportionate? Would 90% be disproportionate? How about 75%? These are unanswerable questions because designating something as "disproportionate" requires one to know what is "proportionate," and that is what is missing from the district court's analysis. The Court never explains what makes a tax "proportionate" or "disproportionate" to

the airport.  If a tax is not targeted at airport businesses (i.e., is "proportionate"), one would expect the percentage of the tax paid by airport businesses to correspond roughly to the percentage of overall commercial activity occurring at the airport. That percentage is well less than 1%, supported by any number of statistical sources.[38]  Alternatively, since the Fee at issue here is purportedly directed at congestion (rather than commercial activity), one could rationally look to the percentage of congestion contributed by vehicles rented from the airport, measured by vehicle miles traveled on the roadways.  That number is approximately 1.5%.[39] Whichever figure is used, 1% or 1.5%, it is **far** disproportionate to the percentage of the fee that is extracted from the airport, which is 50%.  The Fee has a disproportionate effect on air travelers and the businesses that serve them, and the district court was wrong to conclude otherwise.

## ARGUMENT

### A.    Standard of Review

This Court reviews a "grant of summary judgment de novo, applying the same legal standard as the district court."  *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318,

---

[38]    U.S. airport operations constitute approximately 0.2% of U.S. GDP.  *See* Federal Aviation Administration, *The Economic Impact of U.S. Civil Aviation* at 15 (table 5) (Sept. 2024), available at: www.faa.gov/2024-economic-impact-report.pdf.

[39]    Derived as follows:

3% (Percentage of Vehicle Miles Driven by All Rental Vehicles) X

50% (Percentage of Rental Vehicles Rented from the Airport) = 1.5%

1324 (10th Cir. 2010) (citation omitted). In doing so, it must "consider the evidence in the light most favorable to the non-moving party." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019) (citation and internal quotation marks omitted). The court reviews the district court's legal conclusions de novo, including preemption which is "ordinarily consider[ed] . . . a legal issue subject to de novo review." *Cerveny v. Aventis, Inc.*, 855 F.3d 1091, 1096 (10th Cir. 2017); *BNSF Ry. Co. v. Hiett*, 22 F.4th 1190, 1193 (10th Cir. 2022).

### B. Legal Background – The Statutes at Issue

As the district court rightly stated, when interpreting an express preemption clause, such as Subsection (v), "courts must 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress's preemptive intent.'" (V-II, A373, quoting *Commonwealth of P.R. v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016).). "The textual inquiry, though, is not limited to a specific section in isolation—'the text of the whole statute gives instruction as to its meaning,' and courts should 'look to the provisions of the whole law' to determine the meaning of the section at issue.'" (V-II, A373-74, quoting *Star Athletica, LLC v. Varsity Brands Inc.*, 580 U.S. 405, 414 (2017).)

Reference to the overall statutory scheme is particularly appropriate in this case because the preemption statute at issue—49 U.S.C. § 40116—has expanded over time through a series of amendments, each of which must be given effect. "It

is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989).  The court's ultimate "task is to interpret [the] provisions 'as a symmetrical and coherent regulatory scheme' while 'fit[ting] . . . all parts into an harmonious whole.'"  *Gallardo v. Marstiller*, 596 U.S. 420, 441 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

The history of these provisions has been recounted above, but to briefly recapitulate, over the last 50 years, Congress enacted four distinct statutes which make up 49 U.S.C. § 40116 today.  In each case, Congress layered on new protections for air travelers, responding to new forms of taxation adopted by states and localities and remedying gaps in coverage from past provisions.  To summarize:

- In 1973, Congress enacted the Airport Development Acceleration Act of 1973, which broadly prohibited state and local taxation of the air transportation service itself, including passenger head taxes.  Pub. L. No. 93-44, 87 Stat. 88 (1973).

- In 1982, Congress added discriminatory property tax classifications against airlines to the list of prohibited practices.  The provision was modeled on nearly identical provisions previously enacted with respect to railroads and motor carriers.  Pub. L. No. 97-248, § 532, 96 Stat. 324 (1982); *Western Air Lines, Inc. v. Board of Equalization*, 480 U.S. 123, 131 (1987).

- In 1994, in response to state and local taxes aimed at ancillary airport services, such as airport concessions and

shuttle services, Congress expanded protection beyond the air transportation service itself to any business located at the airport. The 1994 provision, however, applied only if the tax was levied "exclusively" at airport locations. Pub. L. No. 103-305, § 112, 108 Stat. 1569 (1994).

- In 2018, in response to the proliferation of "non-exclusive" taxes, Congress barred states and localities from imposing new taxes on airport businesses, with the exception of those that are "generally imposed on sales or services" or "wholly utilized for airport or aeronautical purposes." Pub. L. No. 115-254, § 159(a), 132 Stat. 3186 (2018).

The legislative history of these provisions reflects a persistent and long-term concern with state attempts to export tax burdens to non-residents. As the Supreme Court stated in *Western Air Lines, Inc. v. Board of Equalization*: "It is th[e] temptation to excessively tax nonvoting, nonresident business in order to subsidize general welfare services for state residents that made federal legislation in this area necessary." 480 U.S. at 131.[40]

---

[40] This concern is reflected throughout the very earliest Congressional hearings held on the subject and continued through to its 2018 amendment. *See*, *e.g.*, Hearings Before the House Subcommittee on Transportation and Aeronautics of the Committee on Interstate and Foreign Commerce, 92d Cong., 2d Sess., Serial No. 92-74, at 37 (Jun. 19, 1972) (testimony of Administrator of the Federal Aviation Administration expressing concern that "many municipalities would look to their airport as being a source of revenues for all governmental activities" and "would hope to drain revenues from the airport activities into the general fund and use them for municipality services other than airport investment"); *id.* at 82 ("It is apparent that local governments are finding this new device [the passenger head tax] to be an attractive way to raise additional revenues without burdening the local citizenry.").

While the 2018 amendment adding Subsection (v) is the statute of most relevance to this dispute, all the prior enactments are important and bear relevance to this case—the 1973 enactment because it is the first provision and established the framework on which subsequent enactments were built, the 1982 enactment because it introduced the language about undue burden and discrimination that the district court relied on in its opinion, and the 1994 amendment because it expanded protections to all airport businesses and created the "loophole" that Subsection (v) was designed to remedy.

The text of the statute, color-coded to show the various enactments appears on the next page:

**§ 40116.  State Taxation**

. . .

**(b) Prohibitions**.--Except as provided in subsection (c) of this section and section 40117 of this title, a State, a political subdivision of a State, and any person that has purchased or leased an airport . . . may not levy or collect a tax, fee, head charge, or other charge on--

(1) an individual traveling in air commerce;

(2) the transportation of an individual traveling in air commerce;

(3) the sale of air transportation; or

(4) the gross receipts from that air commerce or transportation.

. . .

**(d) Unreasonable burdens and discrimination against interstate commerce.**

(1) [definitions] . . .

(2)(A) A State, political subdivision of a State, or authority acting for a State or political subdivision may not do any of the following acts because those acts unreasonably burden and discriminate against interstate commerce:

(i) assess air carrier transportation property at a value that has a higher ratio to the true market value of the property than the ratio that the assessed value of other commercial and industrial property of the same type in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

(ii) levy or collect a tax on an assessment that may not be made under clause (i) of this subparagraph.

(iii) levy or collect an ad valorem property tax on air carrier transportation property at a tax rate greater than the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(iv) levy or collect a tax, fee, or charge, first taking effect after August 23, 1994, exclusively upon any business located at a commercial service airport or operating as a permittee of such an airport other than a tax, fee, or charge wholly utilized for airport or aeronautical purposes.

(v) except as otherwise provided under section 47133, levy or collect a tax, fee, or charge, first taking effect after the date of enactment of this clause, upon any business located at a commercial service airport or operating as a permittee of such an airport that is not generally imposed on sales or services by that State, political subdivision, or authority unless wholly utilized for airport or aeronautical purposes.

29

## C. The District Court Misconstrued Subsection (v).

### 1. The Fee is Preempted by Subsection (v).

Colorado's Fee is exactly the kind of imposition that Congress sought to preempt when it added Subsection (v) to 49 U.S.C. § 40116 in 2018. The statute establishes five basic elements. "A State . . . may not . . . **[1]** levy or collect a tax, fee, or charge, **[2]** first taking effect after the date of enactment of this clause [October 5, 2018], **[3]** upon any business located at a commercial service airport or operating as a permittee of such an airport **[4]** that is not generally imposed on sales or services by that State . . . **[5]** unless wholly utilized for airport or aeronautical purposes."

Because half of all rental vehicle transactions occur at the airport, half of the Fee will be collected from airport travelers and businesses. The Fee satisfies all five of the statutory requirements when applied to these airport businesses. It is a "fee" (element 1) imposed after October 5, 2018 (element 2), upon rental car business located at a commercial service airport (element 3), is imposed only on short-term rental car transactions and is therefore "not generally imposed on sales or services" (element 4), and is earmarked for rail projects throughout the State and is therefore not "wholly utilized for airport or aeronautical purposes" (element 5).

2.     The District Court's Reading of Subsection (v) Cannot Be Squared with its Text.

The district court misapplied element 4 and determined that the Fee was valid because it fell within the exclusion for taxes that are "generally imposed on sales or services." 49 U.S.C. § 40116(d)(2)(A)(v). But one cannot square that determination with the actual language of the statute. The district court essentially read the "generally imposed" requirement as if it was imposed in the abstract without any modifying language—as if the exclusion applied whenever a tax is "generally imposed." In that light, it reasoned that the requirement could either be one of subject matter or geography. (V-II, A374-75.)

But of course, that is not what the statute stays. There *is* modifying language. The statute tells us *what* the tax must be "generally imposed" on to be valid. It must be "generally imposed *on sales or services*." This is not a geographic restriction. It is a subject matter restriction. To fall within the exclusion, the tax or fee must be imposed "generally" (i.e., "widely, extensively"[41]) on "sales" or "services." And as described above, the Colorado Fee is not that. It is imposed narrowly on one particular service, *i.e.*, short-term vehicle rentals, not sales or services generally.

One telling sign that the district court's reading is not faithful to the text of the statute is the fact that the court's opinion never tells us *which* "sales or services" a

---

[41]     *See Generally*, Oxford English Dictionary (3d ed. 2015).

31

tax must be "generally imposed" on under the court's reading of the statute.  The logic of the court's reading, however, is that a tax is valid if it is imposed statewide "on sales or services *of the same type*" as those that are taxed at the airport.  But that of course is also not what the statute says—the requirement is that the tax be "generally imposed on sales or services," not that it be "generally imposed on sales or services *of the same type*."   The court's interpretation would add words of limitation into the statute contrary to well-settled rules of statutory interpretation.  "Without some limitation to the contrary, general words . . . are to be accorded their full and fair scope.  They are not to be arbitrarily limited."  Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 101 (2012).

The district court acknowledges this criticism at page 12 of its opinion (ACRA made the same criticism of the State's position on summary judgment) but responds by saying that ACRA's construction of the statute shares the same defect.  The Court says that ACRA's interpretation would also require words to be inserted into the statute—specifically the word "all" before the words "sales or services."[42]

---

[42]     V-II, A381 ("Defendants' proposed reading of subsection (v) does not read words of limitation into the statutory language any more than Plaintiff's does . . . . To the extent Defendants' interpretation compels one to conclude that Congress meant to prohibit fees not generally imposed on goods [*sic*] or services *of the same type*, Plaintiff's interpretation equally requires that Congress meant to prohibit fees not generally imposed on *all* goods [*sic*] or services.")

But ACRA's construction requires nothing of the sort.  The terms "sales" and "services" are general words with clear meanings.  A "sale" is a "transfer of property for a fixed price."[43]  A "service" is the "performance of labor for benefit of another."[44]  The statutory text contains clear direction as to *which* "sales or services" must be subject to a tax for it to pass muster.  It is not "*all*" sales and services, as the district court incorrectly characterizes ACRA's argument.  Instead, the tax must be "*generally* imposed on sales or services"—meaning it must be imposed on them "widely, extensively," "in most situations," or "as a rule."[45]  "All" would conflict with Congress' chosen text – "generally."

While acknowledging that ACRA's interpretation of the text was "not implausible," (V-II, A375), the district court rejected it for two reasons.  Neither of those two reasons stands up to scrutiny.  We discuss those two reasons separately below.

---

[43]  Black's Law Dictionary (6th ed. 1990).

[44]  *Id.*

[45]  All three phrases are common dictionary definitions of the term "generally." *See* Oxford English Dictionary (3d ed. 2015) ("widely, extensively"); Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/generally ("usually, or in most situations"); American Heritage Dictionary (2d College ed. 1985) ("as a rule").

a. The 1982 Preambulatory Language.

First, the court pointed to preambulatory language that Congress added to the statute not in 2018, but 36 years earlier in 1982. That language introduces the list of prohibited practices in section 40116(d)(2). When the language was added in 1982, there were three such prohibited practices. Now, there are five. (Subsection (iv) was added in 1994 and Subsection (v) was added in 2018.) The language provides as follows:

> (2)(A) A State, political subdivision of a State, or authority acting for a State or political subdivision may not do any of the following acts because those acts unreasonably burden and *discriminate against interstate commerce*:
>     (i) …
>     (ii) …
>     (iii) …
>     (iv) .. .
>     (v) . . .

49 U.S.C. § 40116(d)(2)(A).[46]

---

[46] Making matters slightly confusing, certain stylistic changes were made to the perambulatory language when the statute was recodified in 1994. *Compare* Pub. L. No. 97-248 § 532(b) (1982) (original enactment) ("The following acts unreasonably burden and discriminate against interstate commerce, and a State … may not do any of them.) *with* 49 U.S.C. § 40116(d)(2)(A) (1994 codification) ("A State . . . may not do any of the following acts because those acts unreasonably burden and discriminate against interstate commerce.").

The codification statute expressly provides that no substantive change was intended. *See* Pub. L. No. 103-272 § 6(a), 108 Stat. 745 (1994) ("Sections 1–4 of this Act restate, without substantive change, laws enacted before July 1, 1993, that were replaced by those sections. Those sections may not be construed as making a

The district court interpreted this preambulatory language—in particular, the labeling of the prohibited practices as "discriminat[ion] against interstate commerce"—to mean that a tax must discriminate on the basis of geography, i.e., between on-airport and off-airport locations, for it to be prohibited. (V-II, A375 ["Defendant's proposal . . . gives effect to this preambulatory language by ensuring that airport businesses . . . are on equal footing with non-airport businesses."].)

But the preambulatory language (essentially a legislative finding) is in no way inconsistent with ACRA's reading of Subsection (v). The "discriminate" label used in the preamble applies just as comfortably to a tax that discriminates on the basis of subject matter (e.g., rental cars) as it does to a tax that discriminates on the basis of geography (e.g., airports). A tax that targets a particular form of interstate commerce for taxation—rental vehicles, for example—"discriminates" against that form of interstate commerce.

That common-sense reading is supported not only by common usage, but also by the legislative record here, which repeatedly refers to taxes that single out particular industries, such as the rental car industry, as "discriminatory" taxes.[47] For example, Representative Cohen delivered the following description:

---

substantive change in the laws replaced."). *See also Twp. of Tinicum v. U.S. Dep't of Transp.*, 582 F.3d 482, 486 (3d Cir. 2009) (describing the recodification).

[47]  *See* 164 Cong. Rec. H3590, H3597 (Apr. 26, 2018) (purpose of Subsection (v) is to "prevent . . . local and state governments from targeting certain industries for ***discriminatory taxes***, like the car rental industry") (Rep. Graves); 157 Cong.

This amendment would address the [on]-going crisis of *discriminatory* taxes placed on rental car transactions.  I don't need to tell my colleagues how frustrating it is to go rent a car and see huge taxes on your bill, taxes put on your bill by legislative bodies that you don't get a right to vote on most of the time and you don't get to vote on.

It's a simple thing for people to do.  It's cheap taxes from State and local officials to let tourists pay their taxes for their sports arenas and other facilities.  "Don't tax me; don't tax thee; tax that guy behind that tree."  That is not the kind of tax philosophy we should encourage and we should make our State and local officials do taxation in the proper manner which is supposed to be with property taxes or sales taxes or income taxes but not these types of taxes *that discriminate*.  And my jurisdictions have done [it] as well, but it doesn't make it right.[48]

In fact, this was also the meaning the preambulatory language took in the

context of its original enactment in 1982.  The three prohibited practices added in

---

Rec. H2198, H2199 (Mar. 31, 2011) (Rep. Graves) ("[F]or nearly 20 years, state and local governments have taken advantage of a loophole by applying the burden of the tax not only to airport users but all similar entities within that taxing jurisdiction. This has allowed state and local governments to completely circumvent the intent of Congress and levy *discriminatory taxes* against interstate travelers, in particular rental car customers."); *id.* ("Since 1990, more than 117 *discriminatory rental car excise taxes* have been enacted in 43 States and the District of Columbia.") (Rep. Cohen); *id.* ("[on]-going crisis of *discriminatory taxes* placed on rental car transactions"); 155 Cong. Rec. E2867 (Dec. 2, 2009) ("the bulk of … additional charges [on rental vehicles] are state and local *discriminatory excise taxes* on car rental consumers—local taxes imposed to build sport stadiums, convention centers, etc.") (Rep. Boucher).

[48]      157 Cong. Rec. H2198, H2199 (Mar. 31, 2011).  Representative Cohen's remarks were delivered in the context of an earlier amendment, identical in substance to the provision that what was ultimately enacted in 2018.  That earlier amendment, like the 2018 statute, prohibited taxes and fees that were not "generally imposed on sales or services."  *See* 157 Cong. Rec. H2198.

1982 have nothing to do with discrimination on the basis of geography. *See* Pub. L. No. 97-248 § 532(b); 49 U.S.C. §§ 40116(d)(2)(A)(i)-(iii). Instead, they prohibit discriminatory property tax practices against airlines. The finding made by Congress in 1982 was that these three property tax practices "discriminate against interstate commerce." *Id*. And the reason they do so is because they single out a particular form of interstate commerce (airlines) for differential property tax treatment. The language means the same thing in the context of Subsection (v). The industry-specific taxes prohibited under that Subsection likewise "discriminate against interstate commerce" because they single out particular industries (i.e, particular forms of interstate commerce) for taxation.

Indeed, it is not only the original 1982 enactment that supports this reading. The 1982 enactment was itself "modeled on similar provisions in the 4-R Act and the Motor Carrier Act of 1980." *Western Air Lines,* 480 U.S. at 1043. The 4-R Act, enacted in 1976, applies to railroads, and the Motor Carrier Act, enacted in 1980, applies to motor carriers. *See* 49 U.S.C. § 11501(b) (4-R Act); 49 U.S.C. § 14502 (Motor Carrier Act). The two statutes prohibit the same discriminatory property tax practices that Congress extended to airlines in 1982, and they contain the same preambulatory language, which describes the prohibited acts as ones that "unreasonably burden and *discriminate against interstate commerce." See id.* Just like § 40116(d), the "discriminat[ion] against interstate commerce" referred to in the

Motor Carrier Act and the 4-R Act is in the singling out of particular industries for differential tax treatment.

In short, there is nothing in the preambulatory language of Subsection (d)(2)(A) that is in any way inconsistent with ACRA's reading of the statute. But even if there were some ambiguity in the preambulatory language, it is the operative language of Subsection (v) that controls. "The preamble cannot control the enacting part of the statute in cases where the enacting part is expressed in clear, unambiguous terms." *D.C. v. Heller*, 554 U.S. 570, 578 n.3 (2008) (quoting 2A N. Singer, Sutherland on Statutory Construction § 47.04, pp. 145-46 (rev. 5th ed.1992)).

That is particularly so here, where the legislative history of the preambulatory language shows that it was added simply to make clear that Congress was acting pursuant to its constitutional authority to regulate interstate commerce. *See* S. Rep. No. 91-630 at 9-10 (1969) ("In declaring three types of actions to constitute an unreasonable and unjust discrimination against and an undue burden upon interstate commerce, S. 2289 invokes the power of the Congress under the commerce clause of the Constitution, article I, section 8, to promote, foster and protect interstate commerce by relieving and removing burdens thereupon.").

It has been well-established at least since *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 197 (1824) that Congress' authority to regulate interstate commerce is "plenary," *Oregon Waste Systems, Inc. v. Department of Environmental Quality*, 511

38

U.S. 93, 98 (1994), meaning it is free to regulate as much (or as little) as it deems appropriate. So long as the conduct that is regulated is or affects interstate commerce (and there is no suggestion here that it is not), the preamble's invocation of Congress' plenary authority cannot be read to limit the operative provisions that follow.

### b. Policy—Does the Statute Sweep Too Wide?

The second reason the district court gave for rejecting ACRA's interpretation of Subsection (v) was essentially policy-based. The court was concerned the statute would sweep too wide if ACRA's reading were accepted. It would prohibit all targeted taxes at the airport unless the tax revenues were used exclusively for airport purposes. That prohibition would apply not only to taxes aimed at businesses and services located disproportionately at airports (the principal evil that Congress sought to prevent), but also those that were not. The Court pointed to a hypothetical tax on plastic bottles as an example. (*See* V-II, A375 ["If Colorado were to pass a new fee on sales of plastic water bottles, for example, (as it has done with plastic grocery bags, much to my chagrin), Plaintiff's statutory construction would require that this fee not apply to any plastic water bottles at airport locations."].)

But that is not a reason for refusing to enforce the statute as written. Congress has flexibility to determine how broad or how narrow to craft legislation. As Justice Holmes said almost a century ago: "When it is necessary in order to prevent an evil

to make the law embrace more than the precise thing to be prevented, [Congress] may do so.'" *Westfall v. United States*, 274 U.S. 256, 259 (1927).

And it is easy to see why Congress would have made that determination here. As described previously, the entire 50-year history of Congress' regulation of airport taxation has been an elaborate and extended whack-a-mole exercise in which Congress has preempted a specific type of tax only to have states and localities develop workarounds to accomplish the same result: exporting the tax base to air travelers. When Congress enacted its original restrictions prohibiting taxation of air transportation in 1973,[49] states and localities responded with discriminatory property taxes on airlines. When Congress prohibited those in 1982,[50] states and localities responded with taxes targeting ancillary airport services.[51] When Congress prohibited those in 1994,[52] states and localities responded with taxes targeting industries that were disproportionately, but not "exclusively," at airports. This history was well-known when Congress acted in 2018 to close the "loophole" left open by its 1994 legislation.

---

[49]     Pub. L. No. 93-44, § 7(a), 87 Stat. 88, 90 (1973).

[50]     Pub. L. No. 97-248, § 532, 96 Stat. 324 (1982).

[51]     For examples, *see*, *e.g.*, *Salem Transp. Co. v. Port Authority*, 611 F. Supp. 254, 257 (S.D.N.Y. 1985) (ground transportation); *City and Cnty. of Denver v. Continental Air Lines, Inc.*, 712 F. Supp. 834 (D. Colo. 1989) (concessions).

[52]     Pub. L. No. 103-305, § 112, 108 Stat. 1569 (1994).

While Congress *could* have acted narrowly and prohibited only certain types of taxes (e.g., those on industries "disproportionately" serving the airport), that risked having another type of tax pop up and take its place, as well as predictable disputes in application that could frustrate the congressional purpose. There is perhaps no better evidence of that than the district court's own application of a "disproportionate effect" test here, which came to the surprising conclusion that a tax levied 50% at the airport was not disproportionate to the airport, even though less than 1% of all commercial activity occurs at airports. It was wholly within Congress' discretion to avoid that possibility by crafting a bright-line rule that "embraced more than the precise thing to be prevented." *Westfall*, 274 U.S. at 259. *See also Lewis v. Chicago*, 560 U.S. 205, 215 (2010) ("It is not for us to rewrite the statute so that it covers only what we think is necessary to achieve what we think Congress really intended.")

Indeed, this is precisely the policy calculus that Representative Cohen expressed in the passage quoted above. The surest way to (finally) stop states and localities from continuing to target airport travelers was to adopt a bright-line rule requiring taxation at the airport to be done, as he put it, "in the proper manner which is supposed to be with either property taxes or sales taxes or income taxes but not these types of taxes that discriminate":

> It's a simple thing for people to do. It's cheap taxes from State and local officials to let tourists pay their taxes for their sports

41

arenas and other facilities. "Don't tax me; don't tax thee; tax that guy behind that tree." That is not the kind of tax philosophy we should encourage, and ***we should make our State and local officials do taxation in the proper manner which is supposed to be with either property taxes or sales taxes or income taxes but not these types of taxes that discriminate.***[53]

Moreover, the policy consequences the district court suggests are illusory. Contrary to the district court's assumption, ACRA's reading of Subsection (v) would not prohibit states from enacting targeted taxes and fees at the airport. If a state determines that a tax on plastic water bottles is important to discourage their use, then by all means, the tax may be imposed even at the airport. But Subsection (v) would require the revenues from airport locations to be used solely for airport purposes. That safeguard exists to avoid what we have here in Colorado's Fee, which is the temptation to use airports (and the non-residents that frequent them) as a piggy bank to fund unrelated projects benefiting the state as a whole.[54]

---

[53]  *See* 157 Cong. Rec. H2198, H2199 (Mar. 31, 2011) (Rep. Cohen).

[54]  Congressional concern with the diversion of airport revenues transcends the tax provisions at issue in this case. It has also enacted "anti-diversion" safeguards for non-tax revenues as well. *See*, *e.g.*, 49 U.S.C. § 47133 and 49 U.S.C. § 47107(k)(2). The policy considerations are similar. *See generally* David Y. Bannard, A Brief Flight Through Federal Airport Law, 62 Fed. Law. 26, 27 (July 2015); Robert A. Hazel, Understanding an Outlier: The U.S. System of Airport Governance and Economic Regulation, 87 J. Air L. & Com. 131, 155 (2022) ("Why are politicians drawn to airports? For the same reason that Willie Sutton robbed banks—that is where the money is.").

The district court also expressed a concern that ACRA's interpretation would distort the market; it would give a "special, exempt position" to airport businesses and create an "incentive" for "consumers of certain goods . . . to purchase them at airports." (V-II, A375.) But in addition to ignoring the point just made (special taxes can be assessed; they just have to be used for airport purposes), airports already contain much more extensive zones offering entirely tax free shopping—duty-free zones—and there is no suggestion that the market for those goods has been adversely affected. *See* 19 U.S.C. § 1555; *Ammex, Inc. v. Dep't of Treasury*, 726 N.W.2d 755, 767 (Mich. Ct. App. 2006). Is it realistic to expect consumers to flock to airports, pay $5 for parking, and walk a quarter mile to the nearest gift shop—all so that they can avoid a 5 or 10 cent tax on plastic water bottles? As we suggested in the Summary of Argument, the economics for that proposition seem dubious to say the least. But even if they were not, they are concerns for Congress, not the Courts. *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 680-81 (2020) ("The place to make new legislation, or address unwanted consequences of old legislation, lies in Congress.")

> 3. <u>The District Court's Reading Renders Subsection (iv) Superfluous</u>

The district court acknowledged that its reading of the statute might raise superfluity issues. (V-II, A377 ["Plaintiff's strongest argument is that Defendants' interpretation of subsection (v) potentially runs afoul of the canon against

superfluity."].)  The reason is that when Congress enacted Subsection (v) in 2018, the statute already contained a geography-based restriction in Subsection (iv), which prohibited taxes levied "exclusively" at the airport.  Subsection (iv) thus already required that taxes and fees had to be levied both on and off the airport.  If Subsection (v) was interpreted to be a geography-based restriction requiring the same thing, then what work is it performing independent of Subsection (iv)?

The district court answered that objection by interpreting Subsection (v)'s geography-based restriction as being broader than the one in Subsection (iv), prohibiting not only taxes "exclusive" to the airport but also those that "disproportionately affect airports" (V-II, A375, A377), or have a "discriminatory impact against airport businesses" (V-II, A379).  But while that avoids making Subsection (v) superfluous, it creates the opposite problem.  It makes Subsection (iv) superfluous.  The Court acknowledged the issue, but suggested that "[e]ven if [it] were true that subsection (iv) is now a subset of subsection (v), [the court was] not sure that would violate the [superfluity] canon."  (V-II, A378.)

The district court gave two reasons for this conclusion, but respectfully, neither is persuasive.  First, it pointed to the fact that "subsection (iv) predated subsection (v)."  (*Id.*)  But the timing of enactment does not affect the applicability of the rule against superfluity.  The canon "applies to interpreting any two provisions

44

in the U.S. Code, even when Congress enacted the provisions at different times."

*Bilski v. Kappos*, 561 U.S. 593, 607-08 (2010). The canon provides that:

> If a provision is susceptible of (1) a meaning that gives it an effect already achieved by another provision, *or that deprives another provision of independent effect*, and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred.

Reading Law, *supra*, at 176. The canon can be violated in two ways—either by (i) giving a provision a meaning "already achieved by another provision" or (ii) by "depriv[ing] another provision of independent effect." *Id.* The district court's construction of Subsection (v) avoids the first problem but runs smack-dab into the second problem – it "deprives another provision [i.e., Subsection iv] of independent effect."

In support of the idea that the timing of enactment matters, the district court claimed that "Plaintiff's position would have required repealing subsection (iv) while trying to close its loophole" and there is "no reason to think that the canons require that sort of legislative process." (V-II, A378.) But the superfluity canon is not a canon about process; it is a canon of construction. It exists and has persuasive power because it reflects the way statutory language is ordinarily used and interpreted. If it is violated, it suggests that the language is not being read correctly.

An example might help illustrate the point. Suppose a state had a moving violation statute that said something like the following: "the following practices are

declared to be a violation of law: (i) . . . , (ii) . . . , (iii) . . . , (iv) driving in excess of 35 miles per hour." Suppose further that a later legislature determined that the 35 mile per hour limit was too permissive—it created a "loophole" allowing people to drive 33 miles per hour and that was just too fast. If it decided to close that loophole with a more restrictive speed limit, say 30 miles per hour, it could do that in a very straightforward way by amending subsection (iv) to lower the speed limit from 35 to 30. Alternatively, it could take the far more circuitous route of adding a new subsection (v) with the new speed limit, making the statute read as follows:

> "The following practices are declared to be a violation of law:
> (i) . . . ,
> (ii) . . . ,
> (iii) . . . ,
> (iv) driving in excess of 35 miles per hour,
> (v)  driving in excess of 30 miles per hour."

But that would be a very odd way to achieve the legislative objective. It would render subsection (iv) wholly superfluous—"subsection (iv) is now a subset of subsection (v)," in the district court's formulation. There would be no situation where someone could violate subsection (iv) (exceeding 35 miles per hour) without violating subsection (v) (exceeding 30 miles per hour). The legislature certainly *could* amend the speed limit by writing such a statute, but is it likely? No, and if a statute like that came before a court, the rule against superfluity would raise red flags, suggesting that something different must have been intended with subsection

(v), at least if its language could permissibly be interpreted that way.[55] Here, with § 40116(d)(2), the language of Subsection (iv) and (v) does differ and can be interpreted to have different meanings and therefore avoid superfluousness.

The second reason given by the district court why the canon against superfluity might not apply is that Subsections (iv) and (v) create "different sorts of limitations on state and local government." (V-II, A378.) The court analogized Subsection (iv) to a prohibition on "facial discrimination" and Subsection (v) to a prohibition on effects-based discrimination. (V-II, A378-79.) But the court's application of the effects-based test belies this description. The Court determined that a tax that was 99% applicable to the airport would fail the test (and would be unlawful) but one that was 50% applicable would not. That test is not one of "disproportionate impact," at least in any conventional sense, but instead is more aptly characterized as an "almost exclusively" test. A tax is valid unless it applies almost exclusively, i.e., ~99%, to the airport.

---

[55] For example, suppose the new subsection (v) added by the legislature read slightly differently from the version in text. Suppose it said it was unlawful to "*convey a vehicle* in excess of 30 miles per hour." Subsection (iv) continued to say that it was unlawful to "*drive* in excess of 35 miles per hour." "Conveying" and "Driving" are close cousins. In a different context, they might both be read to mean the same thing, i.e., operating a motor vehicle. But in this context, the rule against superfluity would strongly suggest that the legislature intended "conveying" and "driving" to be different—with different speed limits applicable to both.

To be sure, if Congress had wanted to loosen the standard from "exclusively" to "almost exclusively," it could have amended Subsection (iv) to achieve that result. But it makes no sense, and would violate the rule against superfluity, to interpret new Subsection (v) as if it prohibited taxes "almost exclusively," i.e., ~99%, at the airport, while Subsection (iv) simultaneously remains in effect, prohibiting taxes "exclusively," i.e., 100%, at the airport. That "deprives [Subsection iv] of independent effect." Reading Law, *supra*, at 176.

**D. The District Court Misapplied Its Test of "Disproportionate Effect."**

For all the reasons described above, the district court incorrectly construed Subsection (v). The statute bars states and localities from imposing any new tax on airport businesses, except for (i) taxes that are "generally imposed on sales or services"; (ii) taxes "wholly utilized for airport or aeronautical purposes," and (iii) certain aviation fuel taxes. There is no requirement that a taxpayer show the tax also has a disproportionate effect at the airport.

However, even if the district court were correct, its decision would still have to be reversed because the Court incorrectly determined there was no disproportionate effect here. Before turning to the specific reasons why, it should be noted at the outset how surprising such a conclusion would be if it were correct. Fifty percent of vehicle rentals take place at the airport. Other than air transportation services themselves, it is hard to imagine an industry that is more concentrated at

airports than the rental car industry. Indeed, it is precisely this disproportion that makes rental car taxes so appealing: "Rental car excise taxes are used to export a portion of the tax base onto nonresidents who bear a disproportionate burden of the tax."[56]

The district court nevertheless concluded that there was no disproportion here. But in doing so, it failed to specify any objective basis for determining when a tax is "proportionate" or "disproportionate" to the airport. One rational way to determine whether a tax is "proportionate" is to ask what percentage of the tax would be collected from the airport if it was not targeted in a gerrymandered way to airport businesses. In that case, for most taxes, the percentage would correspond roughly to the percentage of overall commercial activity occurring at the airport. That percentage is well less than 1%. (According to the FAA's latest figures, the percentage of overall gross domestic product generated at airports is approximately 0.2%.)[57] Alternatively, since the Fee at issue here is purportedly directed at congestion (rather than commercial activity), one could rationally look to the percentage of congestion contributed by vehicles rented from the airport, measured

---

[56] Tax Foundation, Reforming Rental Car Excise Taxes at 7 (2019), available at www.taxfoundation.org/research/all/federal/reforming-rental-car-excise-taxes.

[57] *See* Federal Aviation Administration, *The Economic Impact of U.S. Civil Aviation* at 15 (table 5) (Sept. 2024), available at: www.faa.gov/2024-economic-impact-report.pdf.

by vehicle miles traveled on the roadways.  That number is approximately 1.5% (i.e., 50% of 3%).  Whichever figure is used, 1.0% or 1.5%, it is ***far disproportionate*** to the percentage of the Fee that Colorado extracts from the airport, which is 50%.

The district court had two responses, neither of which holds up under scrutiny. First, it explained that a 50% threshold was significant because it meant the tax would "be felt in roughly equal magnitude both on and off airport grounds."  (V-II, A378.)  But "equal magnitude" is not the test of disproportion in any other area of discrimination law, and it should not be the one here.  If a protected group, comprising 1% of the population, is in the adversely affected group 50% of the time, that is the very definition of disproportionate effect.

Second, while acknowledging "that rental car users only account for a small portion of miles traveled on Colorado's roads," the court endorsed the State Defendant's suggestion—made in a reply brief to which ACRA could not respond— that this was "offset" by the fact that "vehicle owners in Colorado pay a variety of fees to support Colorado's surface transportation that renters do not."  (V-II, A379, quoting Dkt. No. 27, at 4-5 [V-II, A358-59].)

As explained above, this is a whopper of the first order.  The two fees the State Defendants pointed to, the "Road Safety Fee" and the "Bridge Safety Fee," were both adopted in 2009.[58]  What the State Defendants failed to tell the district court is

---

[58]    *See* Ch. 5, 2009 Colo. Sess. Laws (SB 09-108).

that as part of the same 2009 legislation adopting these two fees, the legislature adopted a third fee, a compensating fee on rental vehicles called the "Daily Vehicle Rental Fee," which was imposed on rental vehicles at $2 *per day*.[59] The 2009 statute expressly provides that the reason rental vehicles are not subject to the Road Safety Fee and the Bridge Safety Fee is because they pay the Daily Vehicle Rental Fee instead.[60] And while the Daily Vehicle Rental Fee on rentals is $2/day, the combined daily rate on the Road Safety and Bridge Safety Fee is eight cents ($0.08) per day up to 19 cents ($0.19) per day, depending on vehicle weight. Given this history, there is no basis whatsoever for the suggestion that the Congestion Impact Fee, adopted some 15 years later, is "offset" by these two fees. Those fees were already more than "offset" by the Daily Vehicle Rental Fee, which was adopted at the same time for the same purpose, and at a rate that is more than 10 times as high.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's judgment, with directions to enter summary judgment on behalf of Plaintiff.

---

[59] *See id.*, sec. 1, § 43-4-804 (emphasis added).

[60] *See* C.R.S. § 43-4-804(1)(a)(III) ("The road safety surcharge shall not be imposed on any rental vehicle on which a daily vehicle rental fee is imposed pursuant to paragraph (b) of this subsection (1)."); C.R.S. § 43-4-805(1)(g)(III) ("The bridge safety surcharge shall not be imposed on any rental vehicle on which a daily vehicle rental fee is imposed pursuant to section 43-4-804(1)(b).").

## STATEMENT ON ORAL ARGUMENT

Appellant American Car Rental Association believes that oral argument would be beneficial because this appeal presents a novel issue of federal law whose determination is important to airport commerce. The district court's ruling is the first federal court decision interpreting and applying 49 U.S.C. § 40116(d)(2)(A)(v).

Dated: September 12, 2025   Respectfully submitted,

       */s/ Daniel H. Schlueter*
       Daniel H. Schlueter
       Jeffrey A. Friedman
       Eversheds Sutherland (US) LLP
       700 Sixth Street, NW, Suite 700
       Washington, DC 20001-3980
       (202) 383-0100
       DanSchlueter@eversheds-sutherland.com
       JeffFriedman@evershed-sutherland.com

       *Attorneys for Appellant*
       *American Car Rental Association*

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2025, I electronically filed the foregoing using the court's CM/ECF system which will send notification of such filing to the following:

Shelby Krantz
shelby.krantz@coag.gov
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

Pawan Nelson
pawan.nelson@coag.gov
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

Date: September 12, 2025

*/s/ Daniel H. Schlueter*
Daniel H. Schlueter

*Attorney for Appellant*
*American Car Rental Association*

# CERTIFICATE OF COMPLIANCE

As required by FRAP 32(a)(7)(C), I hereby certify:

This brief complies with the type-volume limitation of FRAP 32(a)(7)(B)(i) because it contains less than 13,000 words, excluding the parts of the brief exempted by FRAP 32(f) and Tenth Circuit Rule 32(B).

This brief complies with the type-face requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) and the type style requirements of FRAP 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word for Office 16 in 14-point Times New Roman font.

Dated: September 12, 2025

*/s/ Daniel H. Schlueter*
Daniel H. Schlueter

*Attorney for Appellant*
*American Car Rental Association*

# ATTACHMENTS

**Order Granting Defendants' Motion for Summary Judgment, entered May 29, 2025 (ECF No. 28)**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico**

Civil Action No. 1:24-cv-02450-DDD-KAS

AMERICAN CAR RENTAL ASSOCIATION, a District of Columbia
corporation,

      Plaintiff,

v.

HEIDI HUMPHREYS, in her official capacity as Executive Director of
the Colorado Department of Revenue,
SHOSHANA LEW, in her official capacity as Executive Director of the
Colorado Department of Transportation, and
KAREN STUART, in her official capacity as the Chair of the Colorado
High-Performance Transportation Enterprise,

      Defendants.

---

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

---

In this case, Plaintiff American Car Rental Association challenges a
Colorado state law that imposes a $3 per day fee on short-term car rent-
als throughout the state. The Association alleges that this fee is
preempted by federal law. Because it has failed to show that the fee at
issue discriminates against airport businesses, however, Defendants'
motion for summary judgment is granted, Plaintiff's cross-motion is de-
nied, and this case is dismissed.

## BACKGROUND

On May 16, 2024, Colorado Governor Jared Polis signed S.B. 24-184,
which imposes a "Congestion Impact Fee" on short-term vehicle rentals
within the state. Dkt. 1 at 2. The law, which went into effect on January

- 1 -
57

1, 2025, directs the Colorado Transportation Investment Office to impose the Fee at a maximum rate of $3 per day "on all short-term vehicle rentals," with "short-term" being defined as "a period of not more than thirty days." Dkt. 23-1 at 21–22. The stated purpose of the law is to support "continued investment in transit and rail infrastructure" and to "foster economic development, reduce traffic congestion, improve safety, mitigate environmental impacts, improve air quality, and improve accessibility for all citizens, fostering a more interconnected and vibrant state." *Id*. at 1–2.

Plaintiff American Car Rental Association, a corporation whose "members include car rental businesses that operate in Colorado," alleges that the Fee is preempted by federal law. Specifically, Plaintiff alleges that the Fee is preempted by the Anti-Head Tax Act and the FAA Reauthorization Act (codified in relevant part at 49 U.S.C. § 40116), which prohibit "a tax, fee, or charge. . . upon any business located at a commercial service airport or operating as a permittee of such an airport that is not generally imposed on sales or services by that State, political subdivision, or authority unless wholly utilized for airport or aeronautical purposes." 49 U.S.C. § 40116(d)(2)(A)(v) (sometimes referred to as "subsection (v)"). Plaintiff argues that although the Fee is imposed on car rental services operating on and off airport premises, it is not "generally imposed on sales or services" because it "is targeted to a *particular* type of service, *i.e.*, the rental of vehicles." Dkt. 22 at 7. In other words, because it is not imposed on *all* sales or services, as a general sales tax would be, Plaintiff argues that it is proscribed by subsection (v). It claims the Fee is invalid as to any affected airport in Colorado (though it concedes that the Fee is valid throughout the rest of the state). Dkt.

24 at 20 ("ACRA's claim [] attacks the Fee only insofar as it applies to the airport.").

Defendants, maintain that the Fee is not preempted by federal law because it is "generally imposed" both on and off airport premises. Dkt. 23 at 7. Even though the Fee only applies to short-term car rentals—as opposed to all types of sales and services—it does not discriminate against airports, Defendants argue, and thus does not run afoul of the restrictions outlined in U.S.C. § 40116 (d)(2)(A)(v).

Plaintiff filed a complaint requesting injunctive and declaratory relief on September 5, 2024. Dkt. 1. Because this case does not involve any disputed questions of fact, the parties agreed to an expedited schedule for summary judgment briefing and filed competing summary judgment motions on December 20, 2024. Dkt. 22; 23.

The undisputed facts show that roughly half of Colorado rental car transactions occur at airport locations, and that these transactions are responsible for slightly less than half of the rental car revenue generated in the state. Dkt. 24 at 8. They also show that rental cars account for approximately three percent of the vehicle miles traveled on Colorado roadways. *Id.*

## APPLICABLE LAW

A district court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is material if it could affect the outcome of the suit under the governing law, and a factual dispute is genuine if a rational jury could find for the

nonmoving party on the evidence presented. *Id.* If a reasonable juror could not return a verdict for the nonmoving party, summary judgment is proper, and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In deciding whether the moving party has carried its burden, courts do not weigh the evidence, and instead must view it and draw all reasonable inferences from it in the light most favorable to the nonmoving party. *Adamson*, 514 F.3d at 1145. But a nonmovant's unsupported conclusory allegations or mere traces of evidence are not sufficient to demonstrate a genuine factual dispute. *Maxey v. Rest. Concepts II, LLC*, 654 F. Supp. 2d 1284, 1291 (D. Colo. 2009); *Scott*, 550 U.S. at 380 ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."). And "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

## DISCUSSION

In cases of statutory interpretation, a court must "begin and end [the] inquiry with the text, giving each word its 'ordinary, contemporary, common meaning.'" *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017); *accord Commonwealth of P.R. v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016) (when interpreting express preemption clause, courts must "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress's preemptive intent," and inquiry begins and ends with statutory language when its meaning is plain). The textual inquiry, though, is not limited to a specific section in isolation—"the text of the whole statute gives instruction as

to its meaning," and courts should "look to the provisions of the whole law" to determine the meaning of the section at issue. *Star Athletica*, 580 U.S. at 414.

In this case, the relevant text of 49 U.S.C. § 40116 is as follows:

(d) Unreasonable Burdens and Discrimination Against Interstate Commerce.—

[…]

(2)

(A) A State, political subdivision of a State, or authority acting for a State or political subdivision may not do any of the following acts because those acts unreasonably burden and discriminate against interstate commerce:

[…]

(iv) levy or collect a tax, fee, or charge, first taking effect after August 23, 1994, exclusively upon any business located at a commercial service airport or operating as a permittee of such an airport other than a tax, fee, or charge wholly utilized for airport or aeronautical purposes.

(v) except as otherwise provided under section 47133, levy or collect a tax, fee, or charge, first taking effect after the date of enactment of this clause, upon any business located at a commercial service airport or operating as a permittee of such an airport that is not generally imposed on sales or services by that State, political subdivision, or authority unless wholly utilized for airport or aeronautical purposes.

The question presented by this case is a relatively narrow one: does "generally imposed on sales or services" mean only, as Plaintiff argues, taxes[1] on all sales or all services, or does it mean, as Defendants maintain, that states could only impose new taxes affecting airports so long as they are also generally imposed throughout the rest of the taxing

---

[1]   I refer to taxes for the sake of simplicity, but the analysis applies to fees and charges as well.

jurisdiction? In simplified terms, is the "generality" requirement one of subject matter or one of geography?

Though Plaintiff's argument is not implausible, I am convinced that Defendants are correct. That is largely because their interpretation of subsection (v) is harmonious with the preceding language of subsection (d)(2)(A), which clarifies that the statute is fundamentally about preventing discrimination against interstate commerce. *See* 49 U.S.C. § 40116(d)(2)(A) ("A State, political subdivision of a State, or authority acting for a State or political subdivision may not do any of the following acts because those acts unreasonably burden and discriminate against interstate commerce.") Defendants' proposal—which would ensure that federal law preempts state taxes that disproportionately target airports—gives effect to this preambulatory language by ensuring that airport businesses (and the interstate travelers who patronize them) are on equal footing with non-airport businesses, regardless of whether the subject of the tax is itself general or specific.

Plaintiff's interpretation, on the other hand, is not consistent with subsection (d)(2)(A)'s introductory language. Its proposal would not just prevent discrimination against airport businesses; it would give them a special, exempt position by preempting as to them any tax or fee that is not generally imposed on all goods and services. If Colorado were to pass a new fee on sales of plastic water bottles, for example, (as it has done with plastic grocery bags, much to my chagrin) Plaintiff's statutory construction would require that this fee not apply to any plastic water bottles sold at airport locations. This would result in a strange state of affairs where consumers of certain goods would have an affirmative financial incentive to purchase them at airports. Far from simply preventing discrimination towards interstate commerce, this would result in discrimination *in favor* of airport businesses, at the expense of commercial

activity happening in the rest of the state. Neither the text nor the context nor the manifest purpose of the statute support that result.

Plaintiff responds to Defendants' point that "there is no 'discriminatory treatment' if the tax or fee applies both on-airport and off-airport" by arguing that this "is a classic example of inferring statutory purpose divorced from statutory text." Dkt. 24 at 20–21. As a general matter, I agree that it is improper for a court to infer some Congressional intent from between the lines, so to speak, of a statutory text. But here, Congress was explicit that the prohibition outlined in subsection (v) was listed because such laws "unreasonably burden and discriminate against interstate commerce." I cannot ignore this clear statement any more than I can ignore the rest of the statutory language.

The fact that Plaintiff only seeks an injunction *as to airport businesses* further reveals the disjunction between its proposed interpretation and the explicit statutory goal of preventing discrimination against such businesses. Dkt. 24 at 20 ("ACRA's claim [] attacks the Fee only insofar as it applies to the airport."). If the law enacting the proposed Fee were truly discriminatory, then enjoining it in its entirety should solve that problem. Here, however, Plaintiff concedes that the Fee is valid as to off-airport businesses, and only seeks an injunction as to businesses located on airport grounds. The result would be to give airport businesses an effective subsidy, not to treat them equally.

Plaintiff's strongest argument is that Defendants' interpretation of subsection (v) potentially runs afoul of the canon against superfluity. *See* Dkt. 22 at 18 ("When Congress amended section 40116 to add subdivision (d)(2)(A)(v) in 2018, subdivision (d)(2)(A)(iv) *already* prohibited taxes and fees that applied to on-airport transactions, but not off-airport transactions. If the State's reading were correct, then there would have been no reason to enact subdivision (v) in the first place."); *see also Beck*

*v. Prupis*, 529 U.S. 494, 506 (2000) ("Terms in a statute should not be construed so as to render any provision of that statute meaningless or superfluous."). While I have reservations that Congress only ever passes laws that cover new ground, *see, e.g.,* Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u>, at 176 (2012) ("[L]ike all other canons, [the canon against superfluity] must be applied with judgment and discretion, and with careful regard to context. It cannot always be dispositive because (as with most canons) the underlying proposition is not <u>invariably</u> true."); *U.S. v. Montgomery*, 578 F.Supp.3d 54, 73 (D.D.C. 2021) (the canon against superfluity "is less helpful in cases involving distinct statutory provisions enacted decades apart from one another"), the basic question that Plaintiff asks is a fair one: why would Congress have passed subsection (v) if subsection (iv) already prohibited the exact same conduct?

The answer is that the two subsections do not overlap, at least not completely. By its terms subsection (iv) prohibits taxes that "*exclusively*" apply to airport businesses, so its language permits taxes that disproportionately affect airports if they also nominally apply anywhere else. This is not a theoretical concern. *See Avis Budget Grp. v. Newark*, 48 A.3d 1113, 1116 (N.J. App. Div. 2012) (concluding that motor vehicle rental tax imposed on "designated industrial zones" "within which commercial airports are located" were not violations of subsection (iv)). Subsection (v) closes this loophole by preempting any tax that does not apply with equal force to both airport and non-airport commerce.

Yet one may still ask, what work is (iv) doing if (v) prohibits a broader scope of discrimination? Wouldn't anything covered by (iv) also be covered by (v)? And doesn't that mean that that (v) improperly subsumes (iv) in violation of the canon against superfluity?

- 8 -
64

Not quite. There is, to be sure, significant overlap between the two. But the canon against superfluity only requires what its name implies; it does not require that each provision have entirely distinct coverage—just that total superfluity be avoided. *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 81 (2011) (Scalia, J., dissenting) ("The canon against superfluity is not a canon against verbosity. When a thought could have been expressed more concisely, one does not always have to cast about for some additional meaning to the word or phrase that could have been dispensed with."); *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) ("The canon against surplusage is not an absolute rule[.]"). Even if were true that subsection (iv) is now a subset of subsection (v), I'm not sure that would violate the canon. First, that subsection (iv) pre-dated subsection (v) means that Plaintiff's position would have required repealing subsection (iv) while trying to close its loophole. There is no reason to think that the canons require that sort of legislative process. Second, subsections (iv) and (v) create different sorts of limitations on state and local governments.

Imagine, for instance, a small municipality where 99% of rental car transactions occur at an on-airport location, but the remaining 1% occurs off-airport. If the municipality imposed a fee that only applied at the airport, it would violate subsection (iv). But if same fee at issue here were passed in this hypothetical municipality, it would not be imposed "exclusively upon" the airport business, and thus would not violate the technical meaning of subsection (iv). But it would likely be a violation of subsection (v)'s prohibition against taxes that are not "generally imposed." These two provisions are therefore not coterminous, even if they often overlap and aim to accomplish the same goal.

It is also significant that the State of Colorado's Fee will be felt in roughly equal magnitude both on and off airport grounds. *See* Dkt. 24 at

- 9 -

8. And while Plaintiff is correct that rental car users only account for a small portion of miles traveled on Colorado roads, this is offset, as Defendants note, by the fact that "vehicle owners in Colorado pay a variety of fees to support Colorado's surface transportation infrastructure that renters do not." Dkt. 27 at 4–5 (citing state regulations). Unlike the hypothetical, therefore, there is nothing to support the conclusion that Colorado's Fee has a discriminatory impact against airport businesses or interstate commerce in general.

The two subsections perhaps reflect a similar distinction borne out in the doctrine of the dormant Commerce Clause.[2] Modern dormant Commerce Clause jurisprudence is "driven by concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988)). "[T]his antidiscrimination principle lies at the 'very core' of . . . dormant Commerce Clause jurisprudence." *Nat'l Pork*, 598 U.S. at 369. It thus shares an important fundamental goal with the statute at issue in this case.

One aspect of this doctrine is that a law that facially discriminates against interstate commerce is "virtually *per se* invalid," and will survive only if it "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Davis*, 553 U.S.

---

[2]    The Commerce Clause of the United States Constitution provides that "Congress shall have power . . . [t]o regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3. This clause not only affirmatively grants power to Congress, but also has been held to include a negative implication known as the "dormant" Commerce Clause, which restricts permissible state regulation of interstate commerce. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023).

at 338. This is akin to the restriction in subsection (iv), which also prohibits facial discrimination against airport businesses.

The other aspect of this doctrine is that even a law that is neutral and nondiscriminatory on its face may still be invalid if its "practical effects . . . disclose the presence of a discriminatory purpose." *Nat'l Pork*, 598 U.S. at 377 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)). This is akin to the prohibition in subsection (v), which closes the loophole left open by the technical language of subsection (iv).

One could, of course, argue that there is no need for a rule prohibiting facial discrimination when you already have one that prohibits laws with discriminatory effects. And there is some merit to that argument (the Supreme Court has in fact acknowledged that "'no clear line' separates the *Pike* line of cases from our core antidiscrimination precedents." *Nat'l Pork*, 598 U.S. at 377 (quoting *General Motors Corp. v. Tracy*, 519 U.S. 278, 298 n. 12 (1997))). But even if subsections (iv) and (v) largely cover the same territory, they are still complementary for the same reason that the *Pike* line of cases compliments the rest of the dormant Commerce Clause case law. That each prohibits a different form of discrimination is sufficient to show that each serves a different purpose, even if both cover a lot of the same territory.

It is also worth noting that Plaintiff's proposed interpretation raises its own textual concerns. For one, if subsection (v) prohibited all but general sales taxes, wouldn't that also include a prohibition against any tax exclusively aimed at airport commerce? And wouldn't that mean that Plaintiff's own interpretation causes subsection (v) to subsume (iv) in violation of the canon against superfluity? Further, Plaintiff appears to read the words "fee" and "charge" out of the statute. If all that is allowed under Plaintiff's interpretation of subsection (v) is a general sales or services tax, what work does that leave for "fee" or "charge" to do? In

other words, how would a general sales fee (if such a thing can even be conceived) be any different from a general sales tax? And why would the drafters of subsection (v) have included the extra terms "fee" and "charge" if they were simply redundant with "tax"?

Plaintiff's interpretation would result in a sweeping change in the law by prohibiting states and municipalities from imposing any new excise tax or targeted fee—hardly uncommon means of state and local revenue-generation—without exempting airports. Congress may have the power to do so in our federal system, but if it wished to curtail state and local government's traditional powers in such a dramatic way, one would think it would (and perhaps should) have been clearer that this was its intended result. *See Whitman v. Am Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."). That subsection (v) is plausibly susceptible to multiple interpretations is further reason to adopt the interpretation that would not result in such a major change in the relationship between the federal and local governments.

Plaintiff's other arguments are unavailing. For one, Defendants' proposed reading of subsection (v) does not read words of limitation into the statutory language any more than Plaintiff's does. *See* Dkt. 25 at 4–5. To the extent Defendants' interpretation compels one to conclude that Congress meant to prohibit fees not generally imposed on goods or services *of the same type*, Plaintiff's interpretation equally requires the conclusion that Congress meant to prohibit fees not generally imposed on *all* goods or services. For there to have been no doubt about what Congress meant, one or the other of these modifying phrases would have been necessary. But that is not the issue here. The issue is that what Congress did write is potentially susceptible to two different

interpretations. And for the reasons stated above, I have found that Defendants' proposal is the better one.

Plaintiff's references to legislative history and to case law addressing a 2011 amendment which never went into effect, Dkt. 22 at 14–17, are also unconvincing. In this case, the statutory text is enough on its own to require the conclusion that Defendants must be correct. Subsection (v), by its own language, was always intended to prevent discrimination, and Defendants' reading is the only one that gives it this effect.[3]

## CONCLUSION

It is ORDERED that:

Plaintiff's Motion for Summary Judgment, **Dkt. 22**, is **denied**;

Defendant's Motion for Summary Judgment, **Dkt. 23**, is **granted**; and

The Clerk of Court is **directed to close this case**.

DATED: May 29, 2025                      BY THE COURT:

_Daniel D. Domenico_
Daniel D. Domenico
United States District Judge

---

[3]   Because I have concluded that Defendants' reading of "generally imposed on sales and services" is the correct one, I do not reach their additional argument that the Fee is not imposed on "any business." I am, however, skeptical that they are correct. As Plaintiff notes, "the responsibility for filing returns and making payment of the Fee falls on rental businesses themselves." Dkt. 24 at 15; *see also, e.g., South Dakota v. Wayfair*, 585 U.S. 162, 183 (2018) (finding businesses immune from state sales tax were given "arbitrary advantage" despite the fact that such a tax is charged to consumers).

- 13 -

69

**Final Judgment, entered May 29, 2025 (ECF No. 29)**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-02450-DDD-KAS

AMERICAN CAR RENTAL ASSOCIATION, a District of Columbia corporation,

    Plaintiff,

v.

HEIDI HUMPHREYS, in her official capacity as Executive Director of the Colorado
Department of Revenue,
SHOSHANA LEW, in her official capacity as Executive Director of the Colorado
Department of Transportation, and
KAREN STUART, in her official capacity as the Chair of the Colorado High-
Performance Transportation Enterprise,

    Defendants.

---

## FINAL JUDGMENT

---

In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is entered.

Pursuant to and in accordance with Fed. R. Civ. P. 58(a) and the Order Granting Defendants' Motion for Summary Judgment, filed May 29, 2025, by the Honorable Daniel D. Domenico, United States District Judge, and incorporated herein by reference as if fully set forth, it is hereby

ORDERED that judgment is hereby entered in favor of Defendants, Heidi Humphreys; Shoshana Lew; and Karen Stuart, and against Plaintiff, American Car Rental Association, on Defendants' Motion for Summary Judgment. It is further

ORDERED that plaintiff's complaint and action are dismissed.

1

71

DATED at Denver, Colorado this <u>29th</u> day of May, 2025.

FOR THE COURT:

JEFFREY P. COLWELL, CLERK

<u>s/ Robert R. Keech</u>
Robert R. Keech,
Deputy Clerk

2

# STATUTORY APPENDIX

# 49 U.S.C. § 40116. State Taxation

**(a) Definition.**--In this section, "State" includes the District of Columbia, a territory or possession of the United States, and a political authority of at least 2 States.

**(b) Prohibitions.**--Except as provided in subsection (c) of this section and section 40117 of this title, a State, a political subdivision of a State, and any person that has purchased or leased an airport under section 47134 of this title may not levy or collect a tax, fee, head charge, or other charge on--

> **(1)** an individual traveling in air commerce;
>
> **(2)** the transportation of an individual traveling in air commerce;
>
> **(3)** the sale of air transportation; or
>
> **(4)** the gross receipts from that air commerce or transportation.

**(c) Aircraft taking off or landing in State.**--A State or political subdivision of a State may levy or collect a tax on or related to a flight of a commercial aircraft or an activity or service on the aircraft only if the aircraft takes off or lands in the State or political subdivision as part of the flight.

**(d) Unreasonable burdens and discrimination against interstate commerce.**--

> **(1)** In this subsection--
>
> > **(A)** "air carrier transportation property" means property (as defined by the Secretary of Transportation) that an air carrier providing air transportation owns or uses.
> >
> > **(B)** "assessment" means valuation for a property tax levied by a taxing district.
> >
> > **(C)** "assessment jurisdiction" means a geographical area in a State used in determining the assessed value of property for ad valorem taxation.
> >
> > **(D)** "commercial and industrial property" means property (except transportation property and land used primarily for agriculture or timber growing) devoted to a commercial or industrial use and subject to a property tax levy.
>
> **(2)(A)** A State, political subdivision of a State, or authority acting for a State or political subdivision may not do any of the following acts because those acts unreasonably burden and discriminate against interstate commerce:
>
> > **(i)** assess air carrier transportation property at a value that has a higher ratio to the true market value of the property than the ratio that the assessed value of other commercial and industrial property of the same type in the

same assessment jurisdiction has to the true market value of the other commercial and industrial property.

**(ii)** levy or collect a tax on an assessment that may not be made under clause (i) of this subparagraph.

**(iii)** levy or collect an ad valorem property tax on air carrier transportation property at a tax rate greater than the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

**(iv)** levy or collect a tax, fee, or charge, first taking effect after August 23, 1994, exclusively upon any business located at a commercial service airport or operating as a permittee of such an airport other than a tax, fee, or charge wholly utilized for airport or aeronautical purposes.

**(v)** except as otherwise provided under section 47133, levy or collect a tax, fee, or charge, first taking effect after the date of enactment of this clause, upon any business located at a commercial service airport or operating as a permittee of such an airport that is not generally imposed on sales or services by that State, political subdivision, or authority unless wholly utilized for airport or aeronautical purposes.

**(B)** Subparagraph (A) of this paragraph does not apply to an in lieu tax completely used for airport and aeronautical purposes.

**(e) Other allowable taxes and charges.**--Except as provided in subsection (d) of this section, a State or political subdivision of a State may levy or collect--

**(1)** taxes (except those taxes enumerated in subsection (b) of this section), including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services; and

**(2)** reasonable rental charges, landing fees, and other service charges from aircraft operators for using airport facilities of an airport owned or operated by that State or subdivision.

**(f) Pay of air carrier employees.--**

**(1)** In this subsection--

**(A)** "pay" means money received by an employee for services.

**(B)** "State" means a State of the United States, the District of Columbia, and a territory or possession of the United States.

**(C)** an employee is deemed to have earned 50 percent of the employee's pay in a State or political subdivision of a State in which the scheduled flight time of the employee in the State or subdivision is more than 50 percent of the total

scheduled flight time of the employee when employed during the calendar year.

**(2)** The pay of an employee of an air carrier having regularly assigned duties on aircraft in at least 2 States is subject to the income tax laws of only the following:

**(A)** the State or political subdivision of the State that is the residence of the employee.

**(B)** the State or political subdivision of the State in which the employee earns more than 50 percent of the pay received by the employee from the carrier.

**(3)** Compensation paid by an air carrier to an employee described in subsection (a) in connection with such employee's authorized leave or other authorized absence from regular duties on the carrier's aircraft in order to perform services on behalf of the employee's airline union shall be subject to the income tax laws of only the following:

**(A)** The State or political subdivision of the State that is the residence of the employee.

**(B)** The State or political subdivision of the State in which the employee's scheduled flight time would have been more than 50 percent of the employee's total scheduled flight time for the calendar year had the employee been engaged full time in the performance of regularly assigned duties on the carrier's aircraft.

## SEC. 159. STATE TAXATION.

(a) IN GENERAL.—Section 40116(d)(2)(A) of title 49, United States Code, is amended by adding at the end the following:

''(v) except as otherwise provided under section 47133, levy or collect a tax, fee, or charge, first taking effect after the date of enactment of this clause, upon any business located at a commercial service airport or operating as a permittee of such an airport that is not generally imposed on sales or services by that State, political subdivision, or authority unless wholly utilized for airport or aeronautical purposes.''.

(b) RULE OF CONSTRUCTION.—Nothing in this section or an amendment made by this section shall affect a change to a rate or other provision of a tax, fee, or charge under section 40116 of title 49, United States Code, that was enacted prior to the date of enactment of this Act. Such provision of a tax, fee, or charge shall continue to be subject to the requirements to which such provision was subject under that section as in effect on the day before the date of enactment of this Act.

**2024 Colo. Legis. Serv. Ch. 186 (S.B. 24-184) (WEST)**

COLORADO 2024 LEGISLATIVE SERVICE

Seventy-Fourth General Assembly, Second Regular Session

Additions are indicated by <mark>**Text**</mark>; deletions by ~~Text~~.
Vetoes are indicated by ~~Text~~;
stricken material by ~~**Text**~~.

CHAPTER 186
S.B. 24–184

AN ACT CONCERNING SUPPORT FOR THE DEVELOPMENT OF SURFACE TRANSPORTATION INFRASTRUCTURE, AND, IN CONNECTION THEREWITH, PROVIDING FUNDING AND OPERATIONAL FLEXIBILITY NEEDED TO SUPPORT THE DEVELOPMENT OF TRANSIT AND RAIL INFRASTRUCTURE, AND MAKING AN APPROPRIATION.

Be it Enacted by the General Assembly of the State of Colorado:

<< Note: CO ST §§ 29–1–203.5, 32–9–107.5, 32–9–107.7, 32–9–119, 32–22–103, 32–22–106, 43–1–106, 43–1–117.5, 43–4–803, 43–4–804, 43–4–806, 43–4–812 >>

<< Note: CO ST § 43–1–134 >>

SECTION 1. **Legislative declaration.** (1) The general assembly finds and declares that:

(a) Efficient, safe, and sustainable modes of transportation play a vital role in the well-being of Colorado's residents and the prosperity of its communities, and continued investment in transit and rail infrastructure will foster economic development, reduce traffic congestion, improve safety, mitigate environmental impacts, improve air quality, and improve accessibility for all citizens, fostering a more interconnected and vibrant state;

(b) The state needs to strategically address the growing challenges of population growth and growth in recreational traffic and the associated increase in demand for transportation alternatives, and the expansion and improvement of transit and rail networks will alleviate traffic congestion and wear and tear on highways and provide

safer and more reliable transportation options;

(c) A dedicated state funding source for transit and rail projects is essential to building a comprehensive and integrated transportation system that meets the diverse needs of Colorado's residents and visitors;

(d) All rental cars, regardless of where they are rented, use public highways and have a large impact on our public highway systems, adding congestion, wear and tear, and more greenhouse gas (GHG) emissions. Additional cars on our roads from out-of-state visitors, in-state leisure travel, heavy trucks, and vans for moving services have a documented impact, and investments in offsets such as transit and rail services benefit the drivers of those rental vehicles by reducing the amount of traffic congestion that they encounter throughout the state. A generally applicable fee on short-term vehicle rentals would equitably support investment in such offsets to reduce congestion on the public highway system.

(e) While out-of-state visitors and tourists have a positive impact on our economy, the large amount of out-of-state visitors and tourism also has a large impact on traffic congestion and conditions on our public highway system and presents significant challenges to our ability to manage growth in a sustainable way;

(f) Continued investment in transit and rail projects and services advances Colorado's commitment to reducing air pollution, addressing ozone nonattainment, safeguarding the environment and the health of its residents by addressing climate change, and reducing GHG emissions that create climate change;

(g) Although the general assembly and the federal government have passed laws enabling investments to transition single occupancy vehicles and other fleets to electric vehicles, the state cannot reach its traffic congestion and GHG reduction goals without more transit and rail options in the state to provide transportation alternatives and spur transit-oriented development;

(h) Colorado charges road user fees for the purpose of improving our surface transportation systems, and rental cars are one user of our public highway system with a demonstrated impact on traffic congestion on our public highways that could be alleviated and offset by providing new transit and rail services that reduce the traffic congestion and wear and tear they encounter;

(i) Rental cars account for over three percent of the vehicle miles traveled (VMT) on Colorado roadways. Based on the "Urban Mobility Report" produced by the

Texas A&M Transportation Institute, the annual cost of traffic congestion, which takes into account the cost of wasted fuel consumption and travel delays, in the Denver metropolitan area alone was $2.394 billion in 2019, which comes out to $1,263 per commuter and $21.50 per hour of delay. This suggests that the cost of congestion attributable to rental cars statewide is at least $74 million per year, and likely higher. This impact from rental cars can be mitigated with new investments in transit and rail. Investment in passenger rail systems and additional revenue service miles of transit will offset VMT and reduce congestion.

(j) The fee proposed in this legislation would also be applied to the rental of heavy motor vehicles like moving truck rentals, which have significantly higher wear and tear impacts to Colorado roads than traditional passenger vehicles;

(k) The federal government has made available billions of dollars to states, local governments, and private entities in the 2021 bipartisan "Infrastructure Investment and Jobs Act". These federal grants usually provide an 80% federal share and require only a 20% match from the grant recipient, making passenger rail expansion a cost-effective tool for reducing congestion but requiring more state matching money to access federal dollars.

(*l*) Having adequate money to provide the non-federal match for federal grants is essential to allow Colorado to take advantage of this federal money;

(m) In 2021, the general assembly created the front range passenger rail district. The Colorado department of transportation's (CDOT) transit and rail division (division) is conducting a service development plan for front range passenger rail to advance the direction of that law. In October 2023, the transportation commission approved funds to commence a service development plan for the northern rocky mountain rail corridor extending from Denver through northwest Colorado and long distance bus service expansion. The division will complete these projects and continue to support project planning for associated projects.

(n) Front range passenger rail would connect communities from Fort Collins through Denver on to Trinidad through new passenger rail service, shaping development in our state for generations to come and unlocking smart urban planning decisions, density around transit hubs, and mobility options for those who cannot access a car;

(o) As Colorado continues to invest in smart, dense transit-oriented development, it needs high-capacity mass transit to help meet the travel demands of residents, and density itself supports the implementation of mass transit because higher levels of

density and transit service are strongly correlated with a reduction in vehicle miles traveled and general car use, which helps increase affordability for residents;

(p) Urgent action is also required to fulfill our commitment to equity for a just transition for energy impacted communities such as Craig and Hayden that have coal plants completely closing as soon as 2028. As coal plant closures happen and the existing freight business ends with it, we must ensure continuous use of that existing rail line through utilization for passenger rail. As freight traffic volumes, types, and commodities shift and change, we have an opportunity to partner with the freight rail system for dual use of existing freight rail lines to include northern rocky mountain passenger rail service. Establishing passenger rail service from Union Station to west Jefferson County, Winter Park, Steamboat Springs, Craig, and Hayden is a just transition strategy that also reduces traffic congestion in the interstate highway 70 mountain corridor. This train line uniquely fulfills several objectives of the state including relieving traffic congestion in mountain corridors, supporting affordable housing for the local workforce, and aiding coal-dependent communities in enhancing and diversifying their economies.

(q) The southern segment of front range passenger rail is as important as the north segment and the proposed northern rocky mountain rail service. It is imperative that the state continue to pursue this important segment that completes the vision for the full front range passenger rail and is a linchpin to the new federal long distance plan for the country that would create two new long distance service routes through Trinidad connecting to the full proposed front range passenger rail route. The new proposed long distance study map makes Colorado's full front range rail route essential to a new route connecting through Trinidad, Colorado to Albuquerque, New Mexico on to Phoenix, Arizona, and an additional new route that would connect Trinidad to Amarillo, Texas, to Dallas, Texas, and on to Houston, Texas. This makes the southern segment of front range passenger rail not just an important Colorado transportation solution but also of national importance to the future national rail passenger rail network.

(r) In addition to the proposed future passenger rail service for the northern Rocky Mountains, there are multiple other underutilized or abandoned freight rail rights-of-way that could be repurposed for passenger rail service to connect mountain communities with the front range, and the state should continue to explore opportunities for establishing more passenger rail services.

(s) Efforts to expand passenger rail must be complemented by the expansion of a more comprehensive statewide bus system, especially on key corridors like interstate

highways 70 and 25, building on the successes of initiatives like CDOT's Bustang, Snowstang, and Pegasus bus services, with a commitment to improving convenience, and accessibility for all Coloradans and contributing to reductions in GHG emissions and traffic congestion.

(2) The general assembly further finds and declares that:

(a) The Colorado high performance transportation enterprise, which has been doing business as the Colorado transportation investment office (CTIO) since 2021, has a strong track record of using user fee revenue to support the development of surface transportation projects with the primary objective of alleviating traffic congestion within the state;

(b) The CTIO has historically supported multi-modal transportation through the expansion of commuting options in express lanes and the distribution of transit passes to low-income residents, but with the creation of the new dedicated revenue source provided for in this act must now utilize its existing power and charge, as set forth in its enabling legislation, to fund transit and rail projects to further reduce traffic congestion on our highway system;

(c) It is necessary and appropriate to direct the CTIO to update its strategic plan to incorporate policies implementing legislative direction in Senate Bill 21–260, which tasked the transportation commission to establish GHG pollution reduction planning standards and to contribute to the state's implementation of House Bill 19–1261, which established GHG reduction goals for the state;

(d) A major barrier to expanding transit and rail in the state of Colorado is a lack of financing infrastructure and a dedicated revenue source;

(e) The state needs a more equitable transportation system that mitigates the impact that automobiles place on the public highway system, and the state lacks the dedicated revenue source for transit and rail that is needed to fund such a system and mitigate those impacts;

(f) This act directs the regional transportation district (RTD), the front range passenger rail district (FRPRD), the transportation commission and the board of directors of the high-performance transportation enterprise to develop a plan for using their joint authorities and funding streams to deliver the first phase of front range passenger rail from Denver to Fort Collins and to use existing contracts to the extent possible to facilitate the best means to deliver that project and to conduct rail

traffic controller modeling and other analyses for intercity passenger rail from Union Station to Fort Collins for at least two scenarios, including a scenario of three round trips per day and a scenario of five round trips per day;

(g) As it is the desire of the general assembly to ensure not just train service from Union Station to Fort Collins, but also daily service from Trinidad to Pueblo to Fort Collins, this act also requires the FRPRD:

(I) To report to the general assembly regarding a plan and an expeditious timeline by which the FRPRD will implement the whole front-range rail train service from Fort Collins to Pueblo and Trinidad; and

(II) To report periodically to the general assembly regarding its planning and implementation progress and the barriers and challenges it faces for extending service to the southern portion of the FRPRD, encouraging the inclusion in each report of a detailed analysis of the extent of coordination among the host rail companies; and

(h) In the near term, it is necessary and appropriate for CTIO to use the new dedicated revenue stream provided for in this act to finance service that originates from the service development plan for front range passenger rail, the service development plan for the northern rocky mountain rail corridor, the aforementioned statewide bus expansion study, and other strategies to increase the use of public transportation.

(3) The general assembly further finds and declares that:

(a) The division will complete a report on the status of a service development plan for the northern rocky mountain rail corridor by December 31, 2024;

(b) The division has identified potential private partners to operate new passenger rail services along the northern rocky mountain rail corridor;

(c) Western slope communities in Grand, Routt, and Moffat counties have existing and emerging transportation needs that are currently underserved; and

(d) As it is the intent of the general assembly to ensure not only expanded passenger rail service from Denver to Winter Park but also to establish passenger rail service from Denver to Craig and Hayden, this act also requires the division:

(I) To report to the general assembly regarding a plan and an expeditious timeline by which CDOT will deliver passenger rail service from Denver to the Hayden and Craig communities; and

(II) To report periodically to the general assembly regarding its planning and implementation progress and barriers and challenges it faces for extending service along the full length of the northern rocky mountain rail corridor.

(4) The general assembly further finds and declares that once the front range passenger rail line is completed and in service, the voice of Senator Perry Will of Newcastle, Colorado shall be the official voice of front range passenger rail and shall be used to make all announcements on front range passenger rail trains.

SECTION 2. In Colorado Revised Statutes, 29–1–203.5, **amend** (1)(a) as follows:

<< CO ST § 29–1–203.5 >>

**29–1–203.5. Separate legal entity established under section 29–1–203—legal status—authority to exercise special district powers—additional financing powers.** (1)(a) Any combination of counties, municipalities, special districts, or other political subdivisions of this state that are each authorized to own, operate, finance, or otherwise provide public improvements, functions, services, or facilities may enter into a contract under section 29–1–203 to establish a separate legal entity to provide any such public improvements, functions, services, or facilities. **In addition, such a separate legal entity may be established as authorized by sections 32–19–119(1)(w.5), 32–22–106(1)(s.5), 43–1–106(8)(q.5), and 43–4–806(6)(p.5).** Any separate legal entity established is a political subdivision and public corporation of the state and is separate from the parties to the contract if the contract or an amendment to the contract states that the entity is formed in conformity with the provisions of this section and that the provisions of this section apply to the entity.

SECTION 3. In Colorado Revised Statutes, 32–9–107.5, **add** (1)(e) as follows:

<< CO ST § 32–9–107.5 >>

**32–9–107.5. Regional fixed guideway mass transit system—authorization—completion of northwest rail fixed guideway corridor as first phase of front range passenger rail service—legislative declarations. (1)(e) The general**

**assembly further declares that:**

**(I) The completion of construction of a fixed guideway mass transit system in the district's northwest fixed guideway corridor between Union Station in Denver and Longmont, which was promised as part of the district's FasTracks transit expansion program approved by the voters of the district in 2004 but currently operates only between Union Station and Westminster, will help rebuild confidence in the district, and it is of critical importance that every effort be made to secure sufficient funding to quickly complete that corridor;**

**(II) There is an opportunity to obtain significant federal money for the completion of the fixed guideway mass transit system in the district's northwest fixed guideway corridor if service extends beyond the boundaries of the district to Fort Collins and qualifies as intercity rail as a first phase of front range passenger rail service; and**

**(III) Accelerating the provision of fixed guideway service on the northwest rail corridor as the first phase of front range passenger rail service will not in any way slow planning, development, grant seeking, or other activities needed for the expeditious delivery of the remaining elements of front range passenger rail service or unfinished FasTracks projects. Further, existing district service will not be impacted or sacrificed as a result of planning and delivery of the first phase of front range passenger rail service. By completing the northwest portion of front range passenger rail service, which was statutorily required to be prioritized in the legislation that created the front range passenger rail district, the general assembly intends to expedite completion of the entire rail service.**

SECTION 4. In Colorado Revised Statutes, 32–9–107.7, **add** (3) as follows:

<< CO ST § 32–9–107.7 >>

**32–9–107.7. Regional fixed guideway mass transit systems—construction—front range passenger rail service—authorization—completion of northwest rail fixed guideway corridor—limited operations outside district. (3) The district may extend construction and operations of the northwest rail fixed guideway corridor beyond the boundaries of the district if any and all capital and operating expenses that it undertakes outside the district are fully accounted for and reimbursed to the district by a public body.**

SECTION 5. In Colorado Revised Statutes, 32–9–119, **add** (1)(w.5) as follows:

<< CO ST § 32–9–119 >>

**32–9–119. Additional powers of district.** (1) In addition to any other powers granted to the district in this article, the district has the following powers:

**(w.5) In accordance with an implementation plan developed as required by section 32–22–103(5), to enter into a standalone intergovernmental agreement with or create a separate legal entity pursuant to sections 29–1–203 and 29–1–203.5 or pursuant to articles 121 to 137 of title 7 with the department of transportation, the high-performance transportation enterprise, created in section 43–4–806(2)(a)(I), and the front range passenger rail district, created in section 32–22–103(1), to implement the completion of construction and operation of the northwest fixed guideway corridor, including an extension of the corridor to Fort Collins as the first phase of front range passenger rail service;**

SECTION 6. In Colorado Revised Statutes, 32–22–103, **add** (5) as follows:

<< CO ST § 32–22–103 >>

**32–22–103. Front range passenger rail district—creation—purpose—boundaries—reports. (5)(a) In pursuing the completion of construction and operation of the northwest fixed guideway corridor, including an extension of the corridor to Fort Collins as the first phase of front range passenger rail service, the district, the department of transportation, the high-performance transportation enterprise, created in section 43–4–806(2)(a)(I), and the regional transportation district, created in section 32–9–105 , shall provide a report containing an implementation plan for construction and operations of the corridor to the transportation legislation review committee, created in section 43–2–145(1)(a), or its successor committee, and to the governor no later than September 30, 2024. The implementation plan must:**

**(I) Identify all ongoing or completed studies and service development plans that could be leveraged to accelerate approval and permitting and require the district and the department of transportation to use existing contracts to the extent possible to conduct rail traffic controller modeling and other analyses**

for intercity passenger rail service from Union Station to Fort Collins for at least two scenarios, including a scenario of three round trips per day and a scenario of five round trips per day;

(II) Identify and evaluate options for creating a new standalone entity such as a Colorado rail authority, a separate legal entity created pursuant to sections 29–1–203 and 29–1–203.5, a separate legal entity created pursuant to articles 121 to 137 of title 7, or a standalone intergovernmental agreement as a business model with a goal of creating such a separate legal entity or executing such an agreement no later than December 31, 2024; and

(III) Explore the viability of Amtrak or other entities as potential operators for intercity passenger rail service.

(b) In addition to the report required by subsection (5)(a) of this section, no later than March 1, 2025, the district, the department of transportation, the high-performance transportation enterprise, created in section 43–4–806(2)(a)(I), the regional transportation district, created in section 32–9–105, and any separate legal entity created pursuant to sections 29–1–203 and 29–1–203.5 or articles 121 to 137 or title 7 shall provide a report concerning a plan to begin providing front range passenger rail service no later than January 1, 2029, to the house of representatives transportation, housing and local government committee and the senate transportation and energy committee, or their successor committees, and the governor. When developed, the plan must include descriptions of steps taken to maximize the chances of securing federal grant assistance, including policies and strategies relating to reducing climate impacts, providing for all-hazards resilience, enhancing benefits to underserved communities, and promoting investments in high-quality workforce development programs, and of how the project will create good-paying, high-quality, and safe jobs. The parties shall coordinate with stakeholders, including labor organizations, affected communities, underserved communities, local governments, environmental organizations, and businesses, on the development of the plan. The report shall include an assessment of whether additional revenue is needed to support such service and, if so, recommended sources of such funding.

(c) In addition to the reports required in subsections (5)(a) and (5)(b) of this section, if front range passenger service has not begun by January 1, 2029, the district, in cooperation with the department of transportation, the high-performance transportation enterprise, created in section 43–4–806(2)(a)(I),

the regional transportation district, created in section 32–9–105, and any separate legal entity created pursuant to sections 29–1–203 and 29–1–203.5 or articles 121 to 137 of title 7 shall provide a report detailing the reasons why such service has not begun and a detailed plan for providing service on January 1, 2029, and each six months thereafter until service is initiated.

SECTION 7. In Colorado Revised Statutes, 32–22–106, **amend** (1)(s); and **add** (1)(s.5) as follows:

<< CO ST § 32–22–106 >>

**32–22–106. District—general powers and duties—funds created.** (1) In addition to any other powers granted to the district by this article 22, the district has the following powers:

(s) To accept gifts, grants, and donations, whether cash or in-kind in nature, from private or public sources for the purposes of this article 22; ~~and~~

**(s.5) In accordance with an implementation plan developed as required by section 32–9–107.7(4), to enter into a standalone intergovernmental agreement with or create a separate legal entity pursuant to sections 29–1–203 and 29–1–203.5 or pursuant to articles 121 to 137 of title 7 with the department of transportation, the high-performance transportation enterprise, created in section 43–4–806(2)(a)(I), and the regional transportation district, created in section 32–9–105, to implement the completion of construction and operation of the regional transportation district's northwest fixed guideway corridor, including an extension of the corridor to Fort Collins as the first phase of front range passenger rail service;**

SECTION 8. In Colorado Revised Statutes, 43–1–106, **add** (8)(q.5) as follows:

<< CO ST § 43–1–106 >>

**43–1–106. Transportation commission—efficiency and accountability committee—powers and duties—rules—definitions.** (8) In addition to all other powers and duties imposed upon it by law, the commission has the following powers and duties:

**(q.5) In accordance with an implementation plan developed as required by**

**section 32–9–107.7(4), and on behalf of the department, to enter into a standalone intergovernmental agreement with or create a separate legal entity pursuant to sections 29–1–203 and 29–1–203.5 or pursuant to articles 121 to 137 of title 7 with the regional transportation district, created in section 32–9–105, the front range passenger rail district, created in section 32–22–103(1), and the high-performance transportation enterprise, created in section 43–4–806(2)(a)(I), to implement the completion of construction and operation of the regional transportation district's northwest fixed guideway corridor, including an extension of the corridor to Fort Collins as the first phase of front range passenger rail service;**

SECTION 9. In Colorado Revised Statutes, 43–1–117.5, **add** (5) as follows:

<< CO ST § 43–1–117.5 >>

**43–1–117.5. Transit and rail division—created—powers and duties—pilot project to expand transit—reports—repeal. (5)(a) The transit and rail division shall provide a report containing a development plan for rocky mountain rail service to the house of representatives transportation, housing and local government committee and the senate transportation and energy committee, or their successor committees, and the governor no later than December 31, 2024.**

**(b) This subsection (5) is repealed, effective July 1, 2025.**

SECTION 10. In Colorado Revised Statutes, **add** 43–1–134 as follows:

<< CO ST § 43–1–134 >>

**43–1–134. Front range passenger rail service—annual status reports. (1) No later than September 30, 2024, and September 30 of each year thereafter, the department and the front range passenger rail district, created in section 32–22–103(1) shall jointly report to the transportation legislation review committee, created in section 43–2–145(1)(a), or its successor committee, and the governor regarding the status of the service development plan for front range passenger rail service between Trinidad, Pueblo, and Fort Collins. The report must include, at a minimum:**

**(a) A description of the efforts of the department and the district to coordinate with affected entities, including host railroads, the federal railroad**

**administration, other potential operators, and Amtrak, and the extent to which and manner in which such affected entities responded to those efforts; and**

**(b) A plan for full implementation of front range passenger rail service as soon as practicable that includes plans for upcoming ballot measures, federal grants, and other possible interim options for financing necessary infrastructure and operations. The plan must include descriptions of steps taken to maximize the chances of securing federal grant assistance, including policies and strategies relating to reducing climate impacts, providing for all-hazards resilience, enhancing benefits to underserved communities, and promoting investments in high-quality workforce development programs, and of how the project will create good-paying, high-quality, and safe jobs. The parties shall coordinate with stakeholders, including labor organizations, affected communities, underserved communities, local governments, environmental organizations, and businesses, on the development of the plan.**

**(2) Notwithstanding the requirement in section 24–1–136(11)(a)(I), the requirement to submit the report required in this section continues indefinitely.**

SECTION 11. In Colorado Revised Statutes, 43–4–803, **amend** (11), (22), and (27); and **add** (23.5) as follows:

<< CO ST § 43–4–803 >>

**43–4–803. Definitions.** As used in this part 8, unless the context otherwise requires:

(11) "Designated bridge project" means a project that involves the repair, reconstruction, replacement, or ongoing operation or maintenance, or any combination thereof, of a designated bridge by the bridge enterprise pursuant to an agreement between the **bridge** enterprise and the commission or department authorized by section 43–4–805(5)(f). A fair-rated bridge may be included in a designated bridge project or other project involving the repair, replacement, or reconstruction of a designated bridge if including the fair-rated bridge is an efficient use of the bridge enterprise's resources and will result in cost savings or schedule acceleration for a project that will improve safety.

(22) "Surface transportation infrastructure" means a highway, a bridge other than a designated bridge, or any other infrastructure, facility, or equipment used primarily or in large part to transport people **and move freight** on systems that operate on or

are affixed to the ground, **including passenger rail, bus, or other public transportation vehicles.**

**(23.5) "Surface transportation infrastructure project network" means all existing or planned surface transportation infrastructure projects.**

(27) "User fee" means compensation to be paid to the transportation enterprise or a partner of the transportation enterprise, **including the congestion impact fee imposed by the transportation enterprise pursuant to section 43–4–806(7.6),** for the privilege of **either** using surface transportation infrastructure constructed or operated by the transportation enterprise or operated by its partner under the terms of a public-private partnership **or benefitting from the reduced congestion on and improved condition of other surface transportation infrastructure in the state resulting from the availability of surface transportation infrastructure constructed or operated by the transportation enterprise or operated by its partner under the terms of a public-private partnership and from the opportunity to use such surface transportation infrastructure constructed or operated by the transportation enterprise and such other less congested and improved surface transportation infrastructure.**

SECTION 12. In Colorado Revised Statutes, 43–4–804, **amend** (1)(b)(II) as follows:

<< CO ST § 43–4–804 >>

**43–4–804. Highway safety projects—surcharges and fees—crediting of money to highway users tax fund—definition.** (1) The following surcharges, fees, and fines shall be collected and credited to the highway users tax fund created in section 43–4–201(1)(a) and allocated to the state highway fund, counties, and municipalities as specified in section 43–4–205(6.3):

(b)(II) A person who collects the daily vehicle rental fee imposed by ~~subparagraph (I) of this paragraph (b)~~ **subsection (1)(b)(I) of this section** and who pays specific ownership tax on the vehicles rented in the manner specified in either section 42–3–107(11) or (12), ~~C.R.S.,~~ or both, shall, no later than the twentieth day of each month, submit to the department of revenue a report, using forms furnished by the department of revenue, of daily vehicle rental fees collected for the preceding month and shall include with the report the remittance of all such fees. A person who collects the daily vehicle rental fee imposed by ~~subparagraph (I) of this paragraph~~

(b) **subsection (1)(b)(I) of this section** but does not pay specific ownership tax on the vehicles in the manner specified in either section 42–3–107(11) or (12), ~~C.R.S.,~~ or both, shall submit the report and the remittance of fees collected in the same manner or in such other manner as the executive director of the department of revenue may prescribe by rules promulgated in accordance with article 4 of title 24. ~~C.R.S.~~ The executive director of the department of revenue shall forward all daily vehicle rental fees collected, **together with all congestion impact fees imposed by the transportation enterprise pursuant to section 43–4–806(7.6) collected,** to the state treasurer ~~who~~ **and shall identify the amounts of each fee being forwarded. The state treasurer** shall credit the daily vehicle rental fees **imposed pursuant to subsection (1)(b)(I)(A) of this section** to the highway users tax fund **and shall credit the congestion impact fees imposed by the transportation enterprise pursuant to section 43–4–806(7.6) to the transportation special fund as required by section 43–4–806(7.6)(b).**

SECTION 13. In Colorado Revised Statutes, 43–4–806, **amend** (1)(a), (2)(a)(III)(B), (2)(c)(I), (3)(a), (3)(c), (5), (6) introductory portion, (6)(p), (9)(a), and (10)(a); and **add** (1.5), (6)(p.5), (7.6), (7.7), (7.8), and (10)(c) as follows:

<< CO ST § 43–4–806 >>

**43–4–806. Colorado transportation investment office—creation—enterprise status—board—funds—powers and duties—user fees—limitations—reporting requirements—violations on the peak period shoulder lanes—legislative declaration—definitions.** (1) The general assembly hereby finds and declares that:

(a) It is necessary, appropriate, and in the best interests of the state for the state to aggressively pursue innovative means of more efficiently financing important surface transportation infrastructure projects that will improve the safety, capacity, and accessibility of the surface transportation system, **provide diverse, multimodal transportation options that reduce traffic congestion and degradation of existing surface transportation infrastructure and offer more transportation choices for system users,** can feasibly be commenced in a reasonable amount of time, will allow more efficient movement of people, goods, and information throughout the state, and will accelerate the economic recovery of the state;

**(1.5) The general assembly further finds and declares that:**

**(a)(I) The transportation enterprise provides both services to persons who pay**

user fees for the privilege of using surface transportation infrastructure projects and additional impact remediation services to all persons who use or indirectly benefit from the use of the surface transportation infrastructure project network and other surface transportation infrastructure in the state by completing and operating surface transportation infrastructure projects that reduce wear and tear on and increase the reliability, safety, and expected useful life of state highways and bridges, reduce traffic congestion and attendant delays, provide additional transportation options, reduce emissions from air pollutants and greenhouse gas pollutants from motor vehicles, and reduce the adverse environmental and health impacts of such emissions; and

(II) By providing services as authorized by this part 8, the transportation enterprise engages in an activity conducted in the pursuit of a benefit, gain, or livelihood and generates revenue by collecting fees from services users, and therefore operates as a business in accordance with the determination of the Colorado supreme court in Nicholl *v. E–470 Public Highway Authority*, 896 P.2d 859 (Colo. 1995), and the Colorado court of appeals in *TABOR* Foundation *v. Colorado Bridge Enterprise*, 2014COA 106;

(b) Consistent with the determination of the Colorado supreme court in Nicholl *v. E–470 Public Highway Authority*, 896 P.2d 859 (Colo. 1995), that the power to impose taxes is inconsistent with enterprise status under section 20 of article X of the state constitution and the determination of the Colorado supreme court in Colorado Union *of* Taxpayers Foundation *v. City of Aspen*, 2018 CO 36, that a charge is not a tax if the primary purpose of the charge is to not to raise revenue for general governmental purposes, it is the conclusion of the general assembly that the revenue collected by the transportation enterprise from user fees is generated by fees, not taxes, because the user fees imposed by the transportation enterprise:

(I) Are imposed for the specific purpose of allowing the transportation enterprise to defray the costs of completing, operating, and maintaining the surface transportation infrastructure project network;

(II) Thereby:

(A) Fund the specific benefit of the privilege of accessing surface transportation infrastructure projects for user fee payers;

(B) Fund additional benefits of the remediation services provided by the

**transportation enterprise, including reduction of traffic congestion and attendant delays, provision of additional transportation options, reduced emissions from air pollutants and greenhouse gas pollutants from motor vehicles, and reduced adverse environmental and health impacts of such emissions caused by the use of motor vehicles, for user fee payers; and**

**(III) Will be collected at rates that are reasonably calculated by the transportation enterprise board based on the costs of providing the benefits provided to user fee payers and the costs of remediating the impacts caused by fee payers.**

(2)(a)(III)(B) The powers, duties, and functions of the ~~department of~~ transportation **enterprise** include the powers, duties, and functions of the statewide tolling enterprise, created in the ~~commission~~ **department** pursuant to section 43–4–803(1), prior to the repeal and reenactment of said section by Senate Bill 09–108, enacted in 2009, and the statewide tolling enterprise is abolished.

(c) The business purpose of the transportation enterprise is to pursue public-private partnerships and other innovative and efficient means of completing surface transportation infrastructure projects. To allow the transportation enterprise to accomplish this purpose and fully exercise its powers and duties through the transportation enterprise board, the transportation enterprise may:

(I) Subject to the limitations specified in section 43–4–808(3) **and subsection (7.6) of this section,** impose user fees, **including the congestion impact fee authorized by subsection (7.6) of this section,** for the privilege of using surface transportation infrastructure;

(3)(a) The statewide transportation enterprise special revenue fund, referred to in this part 8 as the "transportation special fund", is ~~hereby~~ created in the state treasury. All ~~revenues~~ **revenue** received by the transportation enterprise, including ~~any revenues~~ **all revenue** from **both** user fees **collected from users of a particular surface transportation infrastructure project and congestion impact fees,** collected pursuant to ~~subparagraph (I) of paragraph (c) of subsection (2)~~ **subsections (2)(c)(I) and (7.6)** of this section, ~~shall~~ **must** be deposited into the transportation special fund. The transportation enterprise board may establish separate accounts within the transportation special fund as needed in connection with any specific surface transportation infrastructure project. The transportation enterprise also may deposit or permit others to deposit other ~~moneys~~ **money** into the transportation special fund, but in no event may ~~revenues~~ **revenue** from any tax otherwise available

for general purposes be deposited into the transportation special fund. The state treasurer, after consulting with the transportation enterprise board, shall invest any ~~moneys~~ **money** in the transportation special fund, including any surplus or reserves, but excluding any proceeds from the sale of bonds or earnings on such proceeds invested pursuant **to** section 43–4–807(2), that are not needed for immediate use. Such ~~moneys~~ **money** may be invested in the types of investments authorized in sections 24–36–109, 24–36–112, and 24–36–113. ~~C.R.S.~~

(c) The transportation enterprise shall prepare a separate annual accounting of the user fees collected from any surface transportation infrastructure project upon which any user fee is imposed ~~except that~~ **and of congestion impact fees.** A partner of the enterprise may prepare the annual accounting for a project upon which it imposes a user fee pursuant to the terms of a public-private partnership.

(5) Notwithstanding any other provision of this section, user fee ~~revenues shall~~ **revenue collected from users of a particular surface transportation infrastructure project must** be expended only for purposes authorized by subsection (3) of this section and only for the surface transportation infrastructure project for which they were collected, to address ongoing congestion management needs related to the project, or as a portion of the expenditures made for another surface transportation infrastructure project that is integrated with the project as part of a surface transportation system; except that the transportation enterprise board may ~~use~~ **expend** user fee ~~revenues~~ **revenue** from each surface transportation infrastructure project in proportion to the total amount of such ~~revenues~~ **revenue** generated by the project to pay overhead of the transportation enterprise. **User fee revenue generated by the congestion impact fee imposed by the transportation enterprise pursuant to subsection (7.6) of this section may be expended on any part of the surface transportation infrastructure project network and for overhead of the transportation enterprise.**

(6) In addition to any other powers and duties specified in this section, the transportation enterprise board ~~shall have~~ **has** the following powers and duties:

(p) To transfer money, property, or other assets of the transportation enterprise to the department to the extent necessary to implement the financing of any surface transportation infrastructure project or for any other purpose authorized in this part 8; ~~and~~

**(p.5) In accordance with an implementation plan developed as required by section 32–9–107.7(4), to enter into a standalone intergovernmental agreement**

with or create a separate legal entity pursuant to sections 29–1–203 and 29–1–203.5 with the regional transportation district, created in section 32–9–105, the front range passenger rail district, created in section 32–22–103(1), and the department, to implement the completion of construction and operation of the regional transportation district's northwest fixed guideway corridor, including an extension of the corridor to Fort Collins as the first phase of front range passenger rail service; and

(7.6)(a)(I) In addition to any other powers and duties specified in this section, on and after January 1, 2025, the transportation enterprise shall impose a congestion impact fee on all short-term vehicle rentals at a maximum rate, as determined by the transportation enterprise board, that is reasonably calculated to generate only the amount of revenue needed to pay the overall costs of providing the services to fee payers that will be funded with that revenue and that is, except as otherwise provided in subsection (7.6)(c) of this section, no more than three dollars per day for any vehicle; except that a subsequent renewal of a short-term vehicle rental is exempt from the fee to the extent that the renewal extends the total rental period beyond thirty days. A car sharing program shall collect the congestion impact fee for any short-term vehicle rental of twenty-four hours or longer that is enabled by the car sharing program.

(II) As used in this subsection (7.6), unless the context otherwise requires:

(A) "Battery electric motor vehicle" has the same meaning as set forth in section 43–4–1202(1).

(B) "Car sharing program" has the same meaning as set forth in section 6–1–1202(4).

(C) "Plug-in hybrid electric motor vehicle" has the same meaning as set forth in section 43–4–1202(14).

(D) "Short-term vehicle rental" means the rental of any motor vehicle, as defined in section 42–1–102(58), with a gross vehicle weight rating of twenty-six thousand pounds or less that is rented within Colorado for a period of not more than thirty days.

(b) The congestion impact fee must be collected, submitted to the department of revenue, administered by the department of revenue, and forwarded by the

department of revenue to the state treasurer in the same manner in which the daily vehicle rental fee imposed pursuant to section 43–4–804(1)(b)(I)(A) is collected, submitted, administered, and forwarded pursuant to section 43–4–804(1)(b)(II). The department of revenue, when forwarding the congestion impact fee to the state treasurer with the daily vehicle rental fee imposed pursuant to section 43–4–804(1)(b)(I)(A), shall identify the amounts of each fee being forwarded, and the state treasurer shall credit all congestion impact fees to the transportation special fund. Any vehicle rented pursuant to a vehicle sharing arrangement that is exempt, pursuant to section 43–4–804(1)(b)(III), from the daily vehicle rental fee imposed pursuant to section 43–4–804(1)(b)(I)(A) is also exempt from the congestion impact fee.

(c)(I) For short-term vehicle rentals beginning during state fiscal year 2026–27 and for short-term vehicle rental periods beginning during any subsequent state fiscal year, the daily limits on the amount of the congestion impact fee set forth in subsection (7.6)(a)(I) of this section are annually adjusted for inflation, and the transportation enterprise shall impose the congestion impact fee in a maximum amount that is the maximum amount for the prior state fiscal year adjusted for inflation. The transportation enterprise shall notify the department of revenue of the amount of the congestion impact fee to be collected for short-term vehicle rentals during each state fiscal year no later than April 1 of the calendar year in which the state fiscal year begins, and the department of revenue shall publish the amount no later than May 1 of the calendar year in which the state fiscal year begins.

(II) As used in this subsection (7.6)(c), "inflation" means the average annual percentage change in the United States department of labor, bureau of labor statistics, consumer price index for Denver-Aurora-Lakewood for all items and all urban consumers, or its applicable predecessor or successor index, for the five years ending on the last December 31 before a state fiscal year for which an inflation adjustment to the congestion impact fee is to be made begins.

(d) Notwithstanding subsection (7.6)(c) of this section, no later than March 1, 2030, and every fifth March 1 thereafter, the transportation enterprise shall complete an analysis of the rate at which it imposes the congestion impact fee, the amount of revenue generated by the fee, and the use of fee revenue in order to ensure that it is continuing to impose the fee at rates that are reasonably calculated to generate only the amount of revenue needed to pay the overall costs of providing the services to fee payers that will be funded with that revenue. If the transportation enterprise determines that it is imposing or with

its next inflation adjustment will be imposing the fee at a rate that generates or will generate more than the needed amount of revenue, it shall lower the rate at which it is imposing the fee or forego or reduce the inflation adjustment to the extent necessary to ensure that it is continuing to impose the fee at rates that are reasonably calculated to generate only the amount of revenue needed to pay the overall costs of providing the services to fee payers that will be funded with that revenue.

(7.7) In addition to any other powers and duties specified in this section:

(a) No later than March 1, 2025, the transportation enterprise shall develop a new multimodal strategic capital plan, which the transportation enterprise board may, at its sole discretion, thereafter update as it deems necessary. The plan must:

(I) Align with the ten-year plan for each mode of transportation approved by the commission in accordance with section 43–1–106(15)(d), the statewide greenhouse gas pollution reduction goals set forth in section 25–7–102(2)(g), and other state greenhouse gas reduction priorities;

(II) Comply with the greenhouse gas transportation planning standard adopted by the commission, any amended or successor standard adopted by the commission, and any other pollution reduction planning standards required for surface transportation infrastructure projects by a federal or state law, regulation, or rule; and

(III) Prioritize benefits to user fee payers and the reduction of adverse impacts on highways.

(b) No later than March 1, 2025, the transportation enterprise shall complete an initial assessment of opportunities available through 2030 to leverage federal money made available to the state. After completing the initial assessment, the transportation enterprise shall assess such opportunities on an ongoing basis.

(7.8) In addition to any other powers and duties specified in this section, the transportation enterprise may enter into a standalone intergovernmental agreement with or create a separate legal entity pursuant to 29–1–203 and 29–1–203.5 with the regional transportation district, created in section 32–9–105, the front range passenger rail district, created in section 32–22–103(1), and the department of transportation to implement the completion of construction and

**operation of the regional transportation district's northwest fixed guideway corridor, including an extension of the corridor to Fort Collins as the first phase of front range passenger rail service.**

(9)(a) The transportation enterprise ~~shall not~~ **is not intended to** supplant or duplicate the services provided by any public mass transit operator, as defined in section 43–1–102(5), railroad, public highway authority created pursuant to part 5 of this article, or regional transportation authority created pursuant to part 6 of this article except as described in detail in an intergovernmental agreement or other contractual agreement entered into by the transportation enterprise and the operator, railroad, or authority. The creation of and undertaking of surface transportation infrastructure projects by the transportation enterprise pursuant to this part 8 is not intended to discourage any combination of local governments from forming a public highway authority or a regional transportation authority.

(10)(a) Notwithstanding section 24–1–136(11)(a)(I), no later than February 15, 2010, ~~and~~ no later than February 15 of each year thereafter **through 2024, and no later than March 1 of each year thereafter,** the transportation enterprise shall present a report to the committees of the house of representatives and the senate that have jurisdiction over transportation. The report must include a summary of the transportation enterprise's activities for the previous year, a summary of the status of any current surface transportation infrastructure projects, a statement of the enterprise's revenues and expenses, and any recommendations for statutory changes that the enterprise deems necessary or desirable. The committees shall review the report and may recommend legislation. The report shall be public and shall be available on the website of the department on or before January 15 of the year in which the report is presented.

**(c) Beginning with the report due no later than March 1, 2025, the report shall also detail the transportation enterprise's work to reduce traffic congestion and greenhouse gas emissions and support the expansion of public transit.**

SECTION 14. In Colorado Revised Statutes, **amend** 43–4–812 as follows:

<< CO ST § 43–4–812 >>

**43–4–812. Use of user fees for transit—legislative declaration.** (1) Notwithstanding any other provision of law, the transportation enterprise, a public highway authority created and existing pursuant to part 5 of this article, a regional

transportation authority created and existing pursuant to part 6 of this article, or any other entity that, as of March 2, 2009, is imposing a user fee or toll for the privilege of traveling on any highway segment or highway lanes may use ~~revenues~~ **revenue** generated by the user fee or toll for **rail**- **and** transit-related projects that relate to the maintenance or supervision of the highway segment or highway lanes on which the user fee or toll is imposed.

(2) The general assembly ~~hereby~~ finds and declares that the funding of **rail**- **and** transit-related projects authorized by subsection (1) of this section constitutes maintenance and supervision of state highways because it will help to reduce traffic on state highways and thereby reduce wear and tear on state highways and bridges and increase their reliability, safety, and expected useful life.

SECTION 15. **Appropriation.** (1) For the 2024–25 state fiscal year, $42,399 is appropriated to the department of revenue. This appropriation is from the general fund. To implement this act, the department may use this appropriation as follows:

(a) $23,175 for tax administration IT system (GenTax) support;

(b) $11,104 for personal services related to taxation services; and

(c) $8,120 for personal services related to administration and support.

SECTION 16. **Safety clause.** The general assembly finds, determines, and declares that this act is necessary for the immediate preservation of the public peace, health, or safety or for appropriations for the support and maintenance of the departments of the state and state institutions.

Approved May 16, 2024.